OPINION *Page 2 
{¶ 1} Defendant-Appellant, Montel Dunn, appeals from his convictions of one count of aggravated murder with gun specification, five counts of improperly discharging a firearm at or into a habitation with gun and/or drive-by specifications, one count of carrying a concealed weapon, one count of receiving stolen property and one count of possession of cocaine. The State of Ohio is Plaintiff-Appellee.
 {¶ 2} On April 30, 2008, Appellant was indicted on one count of aggravated murder with a firearm specification, in violation of R.C. 2903.01(A), five counts of improperly discharging a firearm at or into a habitation with firearm and drive-by specifications, in violation of R.C. 2923.161, one count of carrying a concealed weapon, in violation of R.C. 2923.12(A)(2), one count of receiving stolen property, a felony of the fourth degree, in violation of R.C. 2913.51, and one count of possession of cocaine, a felony of the fifth degree, in violation of R.C. 2925.11(A)(C)(4)(a).
 {¶ 3} Appellant exercised his right to trial by jury and the evidence adduced at trial is as follows:
 I. The Yale Avenue Shooting {¶ 4} On January 15, 2008, Canton Police Officer Kevin Clary responded to a shooting at 1603 Yale Avenue, which was the residence of Jamie Dugger. Ms. Dugger is an acquaintance of Appellant. Officers observed multiple bullet holes in the exterior of the house and eight .9 millimeter shell casings were collected from the scene. (State's Exhibits 1A and 1B).
 {¶ 5} Jamie Dugger testified that she moved to Canton on July 16, 2007, and that she lived with her two children, her mother and stepdad, and her sister, at 1603 *Page 3 
Yale Avenue. Jamie testified that she met Appellant's girlfriend, Kayla Auman approximately twenty years ago because Kayla was a friend of her sister's.
 {¶ 6} Jamie first met Appellant in August, 2007. She stated that Kayla would come to her house and would bring Appellant and two of Appellant's friends, who went by the names "BG" and "D Money".
 {¶ 7} According to Jamie, whenever she would see Kayla and Appellant, Kayla was always driving her car and Appellant would always be in the front passenger seat. Jamie stated that she spoke to Appellant multiple times and that on one occasion, she spoke to him about raising bail money for her boyfriend, who was in jail. Jamie testified that on January 13, 2008, she offered to sell Appellant a handgun for between one hundred twenty-five dollars and one hundred fifty dollars. The gun was a .9mm Hi-Point semi automatic handgun. Appellant bought the gun from her.
 {¶ 8} On January 14, 2008, she saw Appellant, BG, and D-Money at a party. She witnessed BG pushing females around. Someone offered money to Jamie's sister to drive the men home. Approximately five minutes after the group left, Appellant called Jamie, upset because her sister kicked them out of the car after taking the money that they gave her to drive them home.
 {¶ 9} Jamie testified that on January 15, 2008, she and her boyfriend, who was released from jail earlier that day, were at her house when she saw a small dark car pull up outside with its lights off. She watched someone roll the front and back passenger windows down and fire shots at their residence. She saw Kayla Auman driving the vehicle and saw three other people who were African American in the car. She testified that she knew it was Kayla because she was a "real big woman, real white. I mean *Page 4 
pale, white. Blond hair. She always wears her hair the same way. She wears it up in a rat's nest type of thing. She never wears it down. You could point her out anywhere." She was also ninety-nine percent sure that the person in the passenger seat was Appellant.
 {¶ 10} After the car left, Jamie stated that she collected seven to nine shell casings and took them to the police station and spoke with a detective.
 II. The Kalahari Street Shooting {¶ 11} Also on January 15, 2008, Tina Johnson, who resided at 3125 Kalahari St., in Canton, Ohio, reported that at approximately 8:24 p.m., she and her four children were in the kitchen cooking dinner when she heard at least four gunshots hit her house. She stated that one bullet entered the house approximately two feet from where her son was sitting. (State's Exhibits 7A and 7B). She did not see who shot her house.
 III. The Bollinger Avenue Shootings {¶ 12} On January 16, 2008, Travon Barrino was shot and killed in front of 3023 Bollinger Avenue, in Canton, Ohio. Margaret Wilson testified that she lives in East Canton, Ohio with her grandfather and her two children. In January, 2008, Margaret lived at 3023 Bollinger Ave., NE, in Canton with her two daughters. She admitted that she knew Travon through her friend, Tasha, and that Travon had been to her house on multiple occasions. She testified that she saw Travon on Bollinger Avenue almost every day.
 {¶ 13} On January 16, 2008, Margaret testified that she was working at McDonald's on North Main Street, and that she left work at 4:15 p.m. She arrived home with Tasha shortly after 7:30 p.m. As she pulled up to Bollinger Avenue, she saw police *Page 5 
putting up crime scene tape around her house. She testified that an officer approached her vehicle and asked her if she knew "Tramon". She told the officer that she did not know him because she did not know what happened and did not want to get involved. When the officer informed her and Tasha that he had passed away, Tasha jumped out of the car and ran towards him.
 {¶ 14} Margaret testified that she stayed at the scene for about 30 minutes until officers told her she could go and then went to stay with her aunt for a couple of days until officers told her she could return home. When she returned home, she observed a bullet hole in the side of her house that was not there before.
 {¶ 15} Beverly Gadison, who lived at 3017 Bollinger Avenue, testified that she was home on January 16, 2008, when at approximately 7:30 p.m., she heard a loud "boom" followed by several gunshots at the side of her house. She testified that she heard arguing and a loud commotion, then she heard a girl scream and saw a bullet come through her door and go through a wall before it lodged in her husband's coat in a closet.
 {¶ 16} James Russell, who lived at 3014 Bollinger Avenue, testified that at 7:30 p.m. on January 16, 2008, he was in his bedroom watching television when he heard six or seven gunshots outside of his house. He looked out a window and saw a person get into the passenger side of a car before driving away.
 {¶ 17} Another neighbor, Harold Stump, was inside his home at the same time and heard four to five shots. He looked out his window and saw a car that he described as looking like an older Cadillac and saw someone get out of the front passenger seat. *Page 6 
 {¶ 18} Stark County Sheriff's Office deputy, Harry Haines, responded to the scene and walked around the house, where he observed blood next to footprints in the snow. As he followed the footprints, he found Travon lying facedown in the snow against the side of the house at 3017 Bollinger Avenue. He shouted at Travon not to move and to show his hands, but he stated that Travon was unresponsive. Deputy Haines observed a large amount of blood laying around Travon and approached his body. He felt for a pulse and could not find one.
 {¶ 19} Detective Ryan Hostetler of the Stark County Sheriff's Office testified that he arrived at the scene at approximately 8:30 p.m. on January 16. He stated that when he arrived, multiple people were present, including Chief Perez, Captain Shankle, Deputy Wedman, Sergeant Curry, Deputy Haines, Deputy Spidell, and several neighbors, as well as members of the Canton-Stark County Crime lab.
 {¶ 20} Detective Hostetler began his investigation by speaking to neighbors and then identifying the victim. He was able to identify an initial suspect that was a person other than Appellant.
 {¶ 21} During his investigation, he discovered that approximately ten minutes before the shooting, Travon had gone to the Duke and Duchess gas station at 33rd and Harmont to buy a cigar. He was able to obtain security tapes that captured Travon's image at the store that evening about ten minutes prior to the shooting.
 {¶ 22} Approximately two weeks after the murder of Travon Barrino, the Canton-Stark County crime lab was able to complete ballistics testing on the casings collected at 1325 Kalahari Street and 1603 Yale Avenue and was able to match the firearm from *Page 7 
the homicide to the shootings that occurred at these two residences on January 15, 2008.
 {¶ 23} Detective Hostetler spoke with Jamie Dugger, who was able to identify the type of weapon used at her location as well as to identify the assailants, Appellant and Kayla Auman.
 {¶ 24} He was also able to speak to Rashad Gardner, who was confronted by Appellant earlier that week (Tr Vol. II, p. 22) and was able to obtain the license plate number of the car that matched the description of one of the witnesses from the night of the homicide.
 {¶ 25} Deputy Robert First of the Stark County Sheriff's Office was dispatched to Mercy Medical Center after the shooting. Travon Barrino was pronounced dead at the hospital at 10:30 p.m. on January 16, 2008. Deputy First collected Travon's clothing from the hospital.
 IV. The Vienna Road Shooting {¶ 26} On January 28, 2008, Officer William Watkins of the Canton Police Department responded to a shots fired call at 1429 Vienna Road, SW, in Canton, Ohio. Upon arriving at the scene, the resident, Jeanna Jackson reported that someone had fired bullets into her house. Ms. Jackson stated that her son was home with her at the time and that her daughter, Chevy, who was an acquaintance of Appellant's, lived with her as well.
 {¶ 27} Officers observed that three or four bullets went through the exterior of the home and lodged in interior walls of the residence. One spent round was retrieved and *Page 8 
eight shell casings were retrieved along the curb of the house. (State's exhibits 8A and 8B). There were no witnesses to the shooting.
 V. The Testimony of Nikki Woods {¶ 28} On January 16, 2008, Nikki Woods, who is 18 years old, lived at 1706 Vienna Road, SW, with her two children, a 19 month old son, and three and a half month old daughter, her boyfriend, Riley "Buddy" Bennett, her sixteen-year old sister, Christa, her father, and her grandmother. She testified that she has known Appellant since October, 2006, and that she met him through her son's father, Rodney Lawrence.
 {¶ 29} Appellant became involved, off and on, with Nikki's sister, Christa. Both Nikki and Christa would receive letters from Appellant and would write letters back to him. Nikki testified that she was familiar with Appellant's handwriting. Appellant signed some of his letters with a nickname that he had given himself, "Dunn Dada".
 {¶ 30} Nikki testified that Appellant had been to her house numerous times to visit with Buddy and that he had access to every part of her house. She stated that she never met Kayla in person, but saw her sitting in the car when she would drop Appellant off to see Buddy and Christa. Nikki testified that Kayla would sit outside in the car for hours waiting for Appellant. At one point, Nikki attempted to invite Kayla into the house, but Kayla refused to join them.
 {¶ 31} On February 8, 2008, Appellant called Nikki's house. She stated that she stopped talking to him because he tried to say he was at her house when Travon was shot and when Chevy's house was shot. She stated that this was not true, and that Appellant was at her house before and after the shootings, but not during them. *Page 9 
 VI. The Arrest and Investigation {¶ 32} On February 16, 2008, police finally located Appellant through information that Jamie Dugger gave them. They pulled Appellant over on Interstate 77 in a car driven by Kayla Auman with the same license plate that had been reported to be on the car she was driving the night of the homicide, but the license plate had been transferred to a different car. D-Money was also in the car with them.
 {¶ 33} When officers stopped the car, they looked inside the glove box and retrieved a revolver, a baggie of marijuana packaged for sale as well as a baggie of crack cocaine packaged for sale. The officers obtained a search warrant to search the rest of the vehicle. In the trunk, they located a notebook with rap lyrics written by Appellant. Those lyrics described the January 16, 2008, killing of Travon Barrino.
 {¶ 34} The lyrics stated:
 {¶ 35} "I knew you wasn't ready when I had rolled and flashed on you. You started runnin like you was close to kin to Marion Jones. I don't know how you lose weight when these bullets stick to you bones. 3 different brands of nines there goes yo three millz. When the detective took yo momma to identife yo body, I know she went head over hills.
 {¶ 36} "You used to be my nigga now you a fed mu-fucca. I can't believe I used to give you rides on my pegz mu-fucca. You used to be a coo lil dude I broke bread mu-fucca. If I would have put it in words you wouldn't have understanded mu-fucca.
 {¶ 37} "It's fucced up I gotta put this thru yo head mu-fucca. I though you knew that the streets 9s fucced up and you fucced up. *Page 10 
 {¶ 38} "Fount life-less in the trunk throat cut, bullet wound to the temple. Said one line I didn't know that shit was gonna blow yo mind. I don't nessarily gotta get my hands dirty in the field."
 {¶ 39} Officers also recovered a drawing of a .9 millimeter Hi-Point firearm.
 {¶ 40} On February 19, 2008, officers executed another search warrant at 934 4th St., NW, and retrieved a box of Remington 32-30 ammunition. The ammunition fit in the gun that was in the glove box of the car. Upon running the serial number of the gun through the LEADS database, officers discovered that the gun had been reported stolen out of New York.
 {¶ 41} Detective Hostetler interviewed Appellant after he was arrested. Appellant stated that he didn't know anything about the homicide. Appellant stated, "All that he knew was that he heard an individual . . . by the name of Gerald Swain was responsible and that if he heard of anything else, that he would notify us right away."
 {¶ 42} During the interview, Detective Hostetler secured Appellant's DNA sample.
 {¶ 43} Detectives were also able to secure a letter written by Appellant to a person named "Eltin John" that was postmarked March 17, 2008. The letter "appeared to be a hit list of potential witnesses in this case," according to the detectives. The "[l]etter described the individuals' residence, on what time their movements are, when they leave, how they go in, what to do to the persons and then set the house on fire to make it look like an arson to cover up the homicides." (State's Exhibit 32A).
 {¶ 44} The people listed in the letter were Christa Woods, Nikki Woods, Jamie Dugger, the grandmother of Christa and Nikki Woods, Christa's boyfriend, "Buddy", *Page 11 
Christa's father, and any children and pets that were in the residence. Prosecutors presented Nikki with State's Exhibit 32, at trial with the map of the house to be burned down. Nikki identified the handwriting as belonging to Appellant and identified the diagram as a drawing of her house and stated that the diagram was "perfect, to a T." Fifty finger prints and two palm prints contained on this letter belonged to Appellant. The instructions contained within the letter, stated, "I want you to place the gas container [sic] outside of the sliding door around 6:30 a.m. and wait till Krista comes out the front door around 7:00-7:30 a.m. That's when you would make your move. Get her bacc in the house and get control of all subjects. Bring them all in the living room. Have Krista bond everyone with ducc tape hangs and feet behind there [sic] bacc's and once you converm [sic] that they can't move then bond Krista wit the ducc tape hands and feet then I want you to go get that gas container [sic] from the sliding door then pour it all over them and in the living room area. Then throw the empty gas container [sic] in the garage. And before you make it seem like arson I want you to say these exact words, "Mark ass trice" "Trice ass mark". That's when they would know who sent you. Revenge is nothing if the victims don't know who was behind there [sic] demise. Light that dead bandana on flames, drop it then make your escape out of the sliding doors. Nothing lives. Kids and Pets included." He also stated "remember, dead bodies don't talk. You know what to do."
 {¶ 45} Detective Hostetler discovered that the letter was actually sent to an acquaintance of Appellant's named Brian Cochran. Appellant and Brian had a conversation where Appellant requested that witnesses be taken care of and that all the details on how to do it would be contained within a letter to him. *Page 12 
 {¶ 46} Detective Hostetler was able to obtain additional letters sent by Appellant and compared them with the one sent to "Eltin John". In Detective Hostetler's opinion, the letters appeared to be from the same person. The same slang and terminology was used in all of the letters. Additionally, some of the phrases in the letters are phrases that Appellant uses frequently according to the people who forwarded the letters to the police.
 VII. The Testimony of Kayla Auman {¶ 47} Detectives interviewed Appellant's girlfriend, Kayla Auman several times in relation to the shootings. The first time they spoke with her, she told them that she did not know who got out of her car on January 16, 2008, to confront Travon Barrino. Once she went to court for her arraignment and discovered that she was charged with complicity to murder, she sent a kite through the jail system, requesting to speak with Sergeant John Oliver and Agent Jim Amendolar of the Stark County Sheriff's Office. During the second interview, no promises regarding a plea were made to Kayla, but she proceeded to tell detectives her role in the shootings and that Appellant was the person who killed Travon Barrino. She told the detectives that Appellant was carrying a .9 millimeter Hi-Point handgun and that she heard at least sixteen shots fired at that time by Appellant. She also told the detectives that Appellant used another firearm during the murder as well.
 {¶ 48} Kayla testified at trial to the following:
 {¶ 49} She is twenty years old and is serving ten years in prison after pleading guilty to five counts of complicity to improperly discharging a firearm into a habitation *Page 13 
with firearm specifications. She testified that there is no opportunity for early release from her prison term.
 {¶ 50} She met Appellant in the summer of 2007 at the Chips Townhouses. She stated that she and Appellant were friends at first, but then their relationship developed into a sexual relationship where she saw him daily. She often spent time with him and several friends that he called his "brothers." The two men that he most frequently spent time with were Bruce Nelson ("BG") and Deon Williams ("D-Money"). Kayla testified that she would hang out with Appellant, BG, and D-Money, and that she would drive them places that they needed to go and would go with them and get drunk on multiple occasions. Kayla always drove because Appellant and his friends did not have a car. Appellant always rode in the front seat with Kayla and D-Money and BG would ride in the backseats.
 {¶ 51} In January, 2008, Kayla was still dating Appellant. She testified that she introduced Appellant to Jamie Dugger in January, 2008, and that shortly after he met Jamie, Appellant bought a .9 millimeter Hi-Point handgun from her. Kayla admitted to giving Appellant part of the money to purchase the gun.
 {¶ 52} Kayla testified that on January 15, 2008, she was driving on Kalahari with Appellant, D-Money and BG when she saw someone who looked like a guy who had given her an STD. Appellant, D-Money, and BG all jumped out of the car. She saw that Appellant had his gun with him. They approached the man, and Kayla realized that it was not the person that she thought it was. They confronted the man anyhow, and took his wallet, his money, and his identification. His identification stated his name was "Rashad." *Page 14 
 {¶ 53} The men jumped back into the car and Appellant told Kayla to drive. Approximately one minute later, while they were still on Kalahari, Appellant began shooting out the passenger window. Kayla thought that someone in the back might be shooting too, but she was not sure.
 {¶ 54} Later that same evening, Kayla, Appellant, BG and D-Money were driving around when Appellant told Kayla that he wanted her to drive to 16th and Yale because he wanted to shoot up Jamie Dugger's house. Kayla testified that she kept driving around because she did not want to stop. Appellant again ordered her to go to Jamie Dugger's house. When she did, he told her to stop the car and turn off the lights. Kayla did as she was told. Appellant then pulled out his gun and someone in the backseat pulled out another gun, which Kayla described as a silver .9 millimeter. They both started shooting at Jamie's house.
 {¶ 55} The next day, Kayla was again driving with Appellant, BG and D-Money. They were in a 1996 Oldsmobile Cutlass Sierra, with Appellant in the front seat, and D-Money and BG in the back. The group was in the area of Harmont Avenue, 30th Street, and Bollinger Avenue, NE that evening, at a drive-thru carryout on Harmont Avenue. When Kayla pulled out of the drive-thru, Appellant instructed her to immediately make a left turn. She turned left onto Harmont Avenue. He then told her to turn right. He told her to turn right two more times, and then pull over and park the car on Bollinger.
 {¶ 56} Kayla complied with his request and pulled over, turned the car off and turned the lights off as well. She stated that they waited one to two minutes and then she saw somebody walking towards her car from the opposite end of the road. As the person approached the car, she recognized him as Travon Barrino. *Page 15 
 {¶ 57} As Travon passed her car, Appellant jumped out of the car. Kayla heard some mumbling, but could not make out what was being said because the car windows were up. The next thing that she heard was two to three gun shots. She looked and saw Travon running away holding the back of his leg. She kept hearing gunshots after that. Appellant came back to the car and took D-Money's silver gun, and went after Travon and kept firing. She then saw Travon lying up against the side of a house and saw Appellant stand over top of him and keep shooting him. No one else got out of the car with Appellant.
 {¶ 58} When Appellant returned to the car, he handed the silver gun back to D-Money and told him to clean it in bleach. He then gave Kayla instructions to drive. They ended up in a music studio, where Appellant and his friends began writing and listening to music lyrics. Later that night, Appellant disposed of his clothes from the shooting. According to Kayla, he threw his shirt in BG's girlfriend's trash can. He threw his hoody in a dumpster next to the house. He hid his boots in Toya's closet and put his pants in the trunk of Kayla's car. He also told Kayla that he dropped his pack of Newport cigarettes and lighter at the scene.
 {¶ 59} Several days later, on January 28, Kayla was again driving Appellant around when he told her to stop the car on Vienna Road and turn off the lights. He rolled down his window and stuck the gun out the window. Kayla tried to pull away from the curb, but Appellant told her that he did not tell her to move and made her stop the car again. He then proceeded to shoot out the window at one of the houses. Kayla testified that she thought that they were going to Vienna Road to see his friend, Buddy. *Page 16 
 {¶ 60} Shortly after the shooting on Vienna, Kayla stated that she drove with Appellant to Cleveland, where he got rid of the Hi-Point .9 millimeter gun and exchanged it for a silver revolver. Before he got rid of the Hi-Point, he had Kayla draw a picture of it. He told her to put his name on the paper with the gun drawing. Kayla testified that he named the Hi-Point "Blow Job Betty".
 {¶ 61} When Kayla, Appellant, BG, and D-Money were stopped on Interstate 77, the police recovered the drawing along with a legal pad belonging to Appellant and a spiral notebook belonging to Appellant, which Kayla stated he purchased after Travon's death.
 {¶ 62} When Appellant was in jail awaiting trial on these charges, he attempted to contact Kayla twice. In the second letter, he wrote, "You both know when it all boils down everything is going to be all right. I'm going to or I'm going to give you the best advice anybody can give you at the time. Silence will set you free because once you open your mouth speaking on stuff that you don't know anything about that's when you put yourself at the scene and basically just sign yourself up for a long prison sentence and prison is a place neither one of us want to go."
 VIII. The Ballistics Evidence {¶ 63} Kylie Graham, a criminalist from the Canton-Stark County Crime Lab examined the revolver recovered from Kayla Auman's car on February 16, 2008. She was classified as an expert in DNA analysis. She concluded that the DNA collected from the revolver belonged to Appellant.
 {¶ 64} A second criminalist from the Canton-Stark Count Crime Lab, Michael Short, was classified as an expert in ballistics and fingerprint examinations. Criminalist *Page 17 
Short testified extensively regarding evidence recovered from the homicide on Bollinger Avenue, and from the shootings on Yale Avenue, Kalahari Street, and Vienna Road.
 {¶ 65} He first testified regarding evidence collected at the scene of the murder of Travon Barrino. He collected a lighter, a pack of Newport cigarettes in a box, and a lighter. He also recovered three deformed bullets, four spent .9 millimeter CCI casings and ten spent .9 millimeter Winchester casings. He also recovered one additional casing the next day when he went back out with a metal detector. In analyzing these casings, he determined that five of the casings came from one weapon (State's Exhibit 1A), and that the rest of the casing came from a second gun (State's Exhibit 1B).[1] His conclusion was that two different firearms were used at the scene.
 {¶ 66} Based on scientific testing, Criminalist Short was able to determine that all of the casings in State's Exhibit 1A came from a Hi-Point firearm because Hi-Points leave distinctive marks on casings and bullets when they are expelled from the firearm. Moreover, based on the extractor and ejector marks on all of the casings contained within State's Exhibit 1B, he determined that the most likely firearm would be a Ruger .9 millimeter handgun.
 {¶ 67} Four additional casings were recovered in the 3000 block of Bollinger Avenue. (State's Exhibits 2A and 2B). Three casings, in State's Exhibit 2A, were determined to have been fired from the same weapon. Based on Criminalist Short's analysis, he determined that the same weapon that fired the casings collected in State's Exhibit 1B fired the casings that were contained in State's Exhibit 2A. He further *Page 18 
determined that the bullet casing in State's Exhibit 2B was fired from the same gun as the bullets contained in State's Exhibit 1A.
 {¶ 68} Four additional casings were collected in front of 3017 Bollinger Avenue. (State's Exhibit 3). Criminalist Short determined that these casings came from the same Hi-Point firearm that was used to shoot the bullets contained in State's Exhibits 1A and 2B.
 {¶ 69} In State's Exhibit 4A, Criminalist Short examined four additional .9 millimeter casings which were collected from the ground at 3023 Bollinger Avenue.
 {¶ 70} These cartridges came from the same gun as the casings in State's Exhibits 1B and 2A. In State's Exhibit 4B, Criminalist Short examined two spent .9 millimeter Winchester casings and determined that they came from the same Hi-Point that fired the bullets in State's Exhibits 1A, 2B, and 3.
 {¶ 71} State's Exhibit 5 contained one .9 millimeter casing that was recovered between 3017 and 3023 Bollinger Avenue the day after the homicide. Criminalist Short examined this casing and determined that it was shot from the same Hi-Point firearm that was identified in State's Exhibits 1A, 2B, 3 and 4B.
 {¶ 72} An additional spent .9 millimeter CCI casing was recovered in the front yard of 3002 Bollinger. (State's Exhibit 6). Criminalist Short examined this casing and determined that it was shot from the same Ruger firearm that was identified in State's Exhibits 1B, 2A, and 4A.
 {¶ 73} Five additional casings were collected around the corner at 3124 30th Street, NE. All of the casings, in Exhibits 7A and 7B, were determined to have come from the same Hi-Point firearm identified in State's Exhibits 1A, 2B, 3, 4B, and 5. *Page 19 
 {¶ 74} Eight shell casings were collected from the shooting at 1429 Vienna Road. (State's Exhibit 8A). A bullet was also recovered from this address as well. (State's Exhibit 8B). Criminalist Short examined these casings and bullet and determined that they were all shot from the Ruger firearm identified in State's Exhibits 1B, 2A, 4A, and 6.
 {¶ 75} A bullet fragment was recovered from the closet of 3017 Bollinger Avenue. (State's Exhibit 9C). Criminalist Short examined this bullet and determined that it was shot from the same Hi-Point firearm identified in State's Exhibits 1A, 2B, 3, 4B, 5, 7A, and 7B.
 {¶ 76} Criminalist Short additionally examined bullets recovered from Travon Barrino's jaw and from the right parietal lobe of his brain. (State's Exhibits 10A and 10B). Upon completing a microscopic comparison of these bullets, Criminalist Short determined that the bullets were all fired from the same weapon, that being a Ruger .9 millimeter firearm. He could not conclusively determine whether the bullets were fired from the same Ruger used in the other shootings, but could not exclude it as being the weapon, either.
 {¶ 77} Two additional bullet fragments were recovered from Travon Barrino's clothing. (State's Exhibits 11 and 12). Upon examining these bullet fragments, Criminalist Short determined that the bullets were fired from the same Ruger that was used to fire the bullets in Exhibits 8B, 10A and 10B. He also confirmed that Ruger makes a stainless steel .9 millimeter handgun.
 {¶ 78} Criminalist Short was asked to view the drawing of the .9 millimeter Hi-Point that Kayla Auman admitted to drawing. Criminalist Short testified that the drawing was "very accurate." *Page 20 
 {¶ 79} Criminalist Short also testified to the presence of gunshot residue (GSR) and bullet holes on items of clothing removed from Travon Barrino after his death. He testified that several of the shots were made within close range of the victim. Specifically, one shot was made within 18 to 24 inches of Travon and several more shots were made within a distance no greater than four and a half feet.
 {¶ 80} Criminalist Short additionally reviewed the letter written to "Eltin John" (State's Exhibit 32A) for fingerprints. Fifty fingerprints and two palm prints were identified on the letter as belonging to Appellant.
 {¶ 81} Dr. Sreenivasa Murthy, Chief Deputy Coroner of the Stark County Coroner's Office testified that he performed the autopsy on Travon Barrino on January 17, 2008. He testified that Travon had 23 entrance and exit wounds on his body and that three of the wounds that he suffered were fatal. The first of these fatal wounds was a gunshot that entered his abdominal cavity, traveled through vital organs in his torso, including his small bowel, large bowel, and severed his aorta and inferior vena cava before exiting near his buttocks. The second fatal wound entered the right parietal lobe and did not exit. The third fatal wound entered in the right occipital lobe, traveled downward, fractured the second vertebrae, went through his larynx and exited beneath Travon's chin. The cause of death was determined to be homicide by multiple gunshot wounds to head, trunk, and extremities with massive blood loss.
 {¶ 82} Appellant raises five Assignments of Error:
 {¶ 83} "I. THE TRIAL COURT ERRED BY NOT SEVERING THE COUNTS OF DISCHARGING A FIREARM INTO A HABITATION UNRELATED TO THE COUNT OF AGGRAVATED MURDER. *Page 21 
 {¶ 84} "II. THE TRIAL COURT ERRED BY ADMITTING EVIDENCE OF AND ARGUMENT ABOUT "OTHER ACTS" PROHIBITED BY EVIDENCE RULE 404.
 {¶ 85} "III. THE APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.
 {¶ 86} "IV. THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.
 {¶ 87} "V. THE APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT."[2]
 I. {¶ 88} In his first assignment of error, Appellant argues that the trial court erred by failing to sever the five counts of improper discharge of a firearm at or into a habitation from the count of aggravated murder. He does not challenge the joinder of the counts of possession of cocaine, receiving stolen property, or carrying a concealed weapon.
 {¶ 89} We would initially note that Appellant did not request relief from prejudicial joinder at trial, and therefore we review this claim under a plain error standard of review. Pursuant to Crim. R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The rule places several limitations on a reviewing court's determination to correct an error despite the absence of a timely objection at trial: (1) "there must be an error, i.e., a deviation from a *Page 22 
legal rule," (2) "the error must be plain," that is, an error that constitutes "an `obvious' defect in the trial proceedings," and (3) the error must have affected "substantial rights" such that "the trial court's error must have affected the outcome of the trial." State v.Morales, 10th Dist. Nos. 03-AP-318, 03-AP-319,2004-Ohio-3391, at ¶ 19, quoting State v. Barnes (2002),94 Ohio St.3d 21, 27, 759 N.E.2d 1240; State v. Gross, 97 Ohio St.3d 121,776 N.E.2d 1061, 2002-Ohio-5524, ¶ 45. The decision to correct a plain error is discretionary and should be made "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Barnes, supra, quoting State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, paragraph three of the syllabus.
 {¶ 90} Criminal Rule 8 provides, in pertinent part:
 {¶ 91} "Joinder of Offenses and Defendants.
 {¶ 92} "(A) Joinder of offenses. Two or more offenses may be charged in the same indictment * * * in a separate count for each offense if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan or are part of a course of criminal conduct."
 {¶ 93} Joinder of offenses is favored, as a general rule, to prevent successive trials, to conserve judicial resources, and to diminish inconvenience to the witnesses. State v. Torres (1981),66 Ohio St.2d 340, 343, 421 N.E.2d 1288. However, "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses * * * the court shall order an election or separate trial of counts * * *." Crim. R. 14. "Weighing the danger of confusion and undue cumulative inference is a matter for the trial judge within *Page 23 
[the judge's] sound discretion. [The judge's] denial of severance is not grounds for reversal unless clear prejudice and abuse of discretion is shown." Johnson v. United States (C.A.8, 1966), 356 F.2d 680, 682, certiorari denied, 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed.2d 84.
 {¶ 94} To determine whether a defendant would suffer prejudice by the joinder of the offenses at trial, a court must determine "(1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." State v. Schaim (1992), 65 Ohio St.3d 51, 59,600 N.E.2d 661, citing State v. Hamblin (1988), 37 Ohio St.3d 153, 158-59,524 N.E.2d 476; Drew v. United States (C.A.D.C., 1964), 331 F.2d 85.
 {¶ 95} It is apparent from a reading of the facts in this case that joinder was proper in that the counts are "based on two or more acts or transactions connected together or constituting parts of a common scheme or plan or are part of a course of criminal conduct."
 {¶ 96} The record here fails to disclose error, plain or otherwise. The evidence reveals a common scheme or plan that is a part of a course of criminal conduct. Appellant shot at five homes and killed one person in a span of fourteen days. The first house that he shot at on January 15, 2008, was on Kalahari Street where Appellant and his friends attacked Rashad Gardner, the man who Kayla Auman identified as being the man who have given her an STD. The second house that he shot at, on the same day, was Jamie Dugger's house, who sold him the gun that he used when killing Travon Barrino. The gun was also used in several of the other shootings. *Page 24 
 {¶ 97} The shootings of the houses at 3017 and 3023 Bollinger Avenue are clearly a part of the course of conduct that resulted from the murder of Travon Barrino, as those houses were shot at when Appellant was shooting at Travon. Any argument to the contrary is simply disingenuous.
 {¶ 98} The shooting at 1429 Vienna Road was also part of the course of conduct as the casings recovered from that shooting were matched to the bullet fragments taken from Travon Barrino's body, thus meaning that the same weapon was used.
 {¶ 99} Moreover, the witnesses overlap between the shootings and the murder. Kayla Auman, the state's key witness, would have to testify as to each offense. Criminalist Short would also have had to testify as to each offense.[3] Jamie Dugger, whose house was shot at on January 15, 2008, was 99 percent sure that Kayla and Appellant were in the vehicle that shot at her house and she was also the person who sold Appellant the Hi-Point used in the shootings. The bullet fragments retrieved from Travon Barrino's body matched the casings taken from the Vienna Woods shooting.
 {¶ 100} Given Appellant's defense that he was not the killer, the evidence of the other shootings would have been admissible under 404(B) to prove Appellant's identity as Travon's killer. The drive-by shootings involved the same two firearms used to kill Travon and Kayla's testimony was admissible to show Appellant's culpability for all of the crimes. See State v. Coley, 93 Ohio St.3d 253, 2001-Ohio-1340, 754 N.E.2d 1129. Moreover, in State v. Williams (1995), 73 Ohio St.3d 153, 158,652 N.E.2d 721, 727, the court allowed a single trial of different robberies when the same gun was used to kill a cab driver and assault a truck driver. *Page 25 
 {¶ 101} Furthermore, the state can separately negate prejudice by showing that "evidence of each crime joined at trial is simple and direct. * * * Thus, when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of" whether the evidence is admissible as other-acts evidence. State v. Lott (1990),51 Ohio St.3d 160, 163, 555 N.E.2d 293. See, e.g., State v. Johnson (2000),88 Ohio St.3d 95, 109-110, 723 N.E.2d 1054, 1068 (assaults against female neighbors); State v. Franklin (1991), 62 Ohio St.3d 118, 123,580 N.E.2d 1, 6 (burglaries in same neighborhood). In this case, the proof of each offense was separate and distinct. The jury was not likely to be confused as to which evidence proved that Appellant had murdered Travon Barrino and which proved that he had shot at the houses on Yale, Kalahari, and Vienna.
 {¶ 102} Appellant's first Assignment of Error is overruled.
 II. {¶ 103} In his second assignment of error, Appellant argues that the trial court erred by permitting "other acts" evidence to be admitted in violation of Evid. R. 404. Specifically, Appellant claims that admitting evidence of the three drive-by shootings on Kalahari, Yale, and Vienna was in error as was admitting testimony regarding the confrontation with Rashad Gardner minutes before the house on Kalahari was shot at.[4]
 {¶ 104} Again, Appellant failed to object to the admissibility of this evidence at trial, so a plain error standard applies.
 {¶ 105} A trial court has broad discretion in the admission and exclusion of evidence. Absent an abuse of discretion resulting in material prejudice to the *Page 26 
defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard. State v. Hymore (1967),9 Ohio St.2d 122, 224 N.E.2d 126.
 {¶ 106} Pursuant to Evid. R. 404, evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion. However, Evid. R. 404(B) sets forth exceptions to this rule. Specifically, it states:
 {¶ 107} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See also R.C. 2945.59.
 {¶ 108} While certainly evidence of the drive-by shootings could be considered 404(B) evidence in relation to the homicide if the drive-by shootings were not indicted, in the case at bar, because there were five counts of improper discharge of a firearm at or into a habitation that were indicted along with the aggravated murder, evidence presented that identified Appellant as the shooter for those counts would not be considered other acts evidence. Rather, testimony as to these acts would be direct evidence of Appellant's guilt in relation to those charges.[5]
 {¶ 109} Even if the evidence of the other shootings was admitted under Evid. R. 404(B), proving the identity of an assailant is an acceptable purpose for admitting other acts evidence. As we stated above, the shootings on Kalahari, Yale, and Vienna involved the same two firearms used to kill Travon. Moreover, Kayla's testimony was *Page 27 
admissible to show Appellant's culpability for all of the crimes. SeeState v. Coley, 93 Ohio St.3d 253, 2001-Ohio-1340, 754 N.E.2d 1129; see also State v. Williams (1995), 73 Ohio St.3d 153, 158, 652 N.E.2d 721,727, (holding that is was permissible to offer evidence in one trial of different robberies when the same gun was used to kill a cab driver and assault a truck driver).
 {¶ 110} Regarding the evidence admitted of Appellant's confrontation with Rashad Gardner, this evidence was properly admitted under Evid. R. 404(B). The confrontation with Gardner occurred on Kalahari mere minutes before Appellant ordered Kayla to drive back down Kalahari and he rolled down his window to shoot at a house on Kalahari. The confrontation is a clear motive for Appellant's actions minutes later.
 {¶ 111} Moreover, the trial court, in its instructions, addressed the issue of other acts evidence. Specifically, the court stated, "Evidence was received about the commission of wrongs or acts other than the offenses with which the Defendant is charged in the trial. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character. If you find that the evidence of other wrongs or acts is true and that the Defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves the absence of mistake or accident, the Defendant's opportunity to comit [sic] the offense charged in this trial, knowledge of circumstances surrounding the offenses charged in this trial, or the identity of the person who committed the offenses in this trial. That evidence cannot be considered for any other purpose." *Page 28 
 {¶ 112} Appellant cannot show that the trial court abused its discretion in admitting this evidence and therefore, his second Assignment of Error is overruled.
 III. {¶ 113} Appellant argues in his third assignment of error that he was denied the right to effective assistance of counsel.
 {¶ 114} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that his trial counsel acted incompetently. Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052. In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, quoting Michel v. Louisiana (1955), 350 U.S. 91, 101, 76 S.Ct. 158,164.
 {¶ 115} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland,466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." Id. at 690.
 {¶ 116} Even if a defendant shows that his counsel was incompetent, the defendant must then satisfy the second prong of theStrickland test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. *Page 29 
 {¶ 117} Appellant first claims that counsel was ineffective for failing to object to the admission of hearsay statements made by Rashad Gardner. Appellant fails to cite to any point in the record where statements made Gardner were presented to the jury. The only two times that Gardner was mentioned was by Detective Hostetler, who interviewed Rashad, but did not testify as to any statement made by Rashad, and during Kayla Auman's testimony when she stated that she saw Gardner (whose name she did not know at the time) walking down the street on January 15, 2008. She told Appellant that Gardner was the man who gave her an STD. Based on that statement, Appellant exited the car and confronted Gardner and took his wallet, money, and identification. Appellant then got back into the car and shot up the house at 3125 Kalahari Street, the same location as where he robbed Gardner. Kayla saw Gardner's identification when Appellant returned to the car. She told officers where Appellant discarded the identification, however, it was never recovered. Trial counsel cross-examined Kayla on this encounter, but no statements of Gardner were ever admitted. Accordingly, Appellant's argument is without merit.
 {¶ 118} Appellant next claims that counsel was ineffective for failing to request severance of the charges of improper discharge of a firearm at or into a habitation from the charge of aggravated murder. As we stated when we overruled Appellant's first assignment of error, joinder of these offenses was proper; accordingly, counsel was not ineffective for failing to request severance, as such a request would have been rightfully denied by the trial court.
 {¶ 119} Appellant's third assignment of error is overruled. *Page 30 
 IV. {¶ 120} In his fourth assignment of error, Appellant argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.
 {¶ 121} When reviewing a claim of sufficiency of the evidence, an appellate court's role is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v.Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. Contrary to a manifest weight argument, a sufficiency analysis raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983),20 Ohio App.3d 172, 175. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.
 {¶ 122} Conversely, when analyzing a manifest weight claim, this court sits as a "thirteenth juror" and in reviewing the entire record, "weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 548, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 123} Appellant only challenges the convictions for aggravated murder and the five counts of discharging a firearm at or into a habitation. *Page 31 
 {¶ 124} In order to convict Appellant of aggravated murder, the prosecution needed to prove that Appellant did, with prior calculation and design, purposely cause the death of Travon Barrino. With respect to the five counts of improper discharge of a firearm at or into a habitation, the prosecution needed to prove that Appellant knowingly discharged a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual. The evidence adduced at trial supports Appellant's convictions.
 {¶ 125} Appellant was convicted of one count of aggravated murder under R.C. 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another * * *." Prior calculation and design requires evidence of "more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." State v. Cotton (1978), 56 Ohio St.2d 8,11, 381 N.E.2d 190. While "`[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves,'" momentary deliberation is insufficient.State v. D'Ambrosio (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, quoting the 1973 Legislative Service Commission Comment to R.C. 2903.01.
 {¶ 126} Where the evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation *Page 32 
and design is justified." State v. Cotton (1978), 56 Ohio St.2d 8,381 N.E.2d 190, paragraph three of the syllabus.
 {¶ 127} A person is presumed to intend the natural consequences of their actions and intent to kill may be found when looking at the circumstances surrounding a homicide, including "the instrument used to produce death, its tendency to destroy life if designed for that purpose and the manner of inflicting a fatal wound." State v. Eley,77 Ohio St.3d 174, 180, 1996-Ohio-323. See also State v. Widner (1982),60 Ohio St.2d 267, 270, 431 N.E.2d 1025; State v. Walker, 5th
Dist. No. 2005-CA-00286, 2006-Ohio-6240, at ¶ 88.
 {¶ 128} Evidence was presented at trial that Appellant and Kayla Auman were at the drive-thru on Harmont Avenue at the same time that Travon Barrino was exiting the Duke and Duchess store next to the drive-thru. Appellant instructed Kayla to drive to Bollinger Avenue, park the car and turn the car off and turn the lights off on the car. One to two minutes later, they watched Travon walk up the street from the direction of the drive-thru.
 {¶ 129} Appellant exited the vehicle and approached Travon. Several words were spoken, and then Appellant began shooting at Travon. He emptied the clip of one of the guns, went back to the car and retrieved a second gun and then pursued Travon as he ran away from Appellant. Appellant continued to advance towards Travon and cornered him at the side of a house between 3017 and 3023 Bollinger Avenue. Appellant also emptied the second weapon into Travon, killing him. When all was said and done, Travon had died as a result of multiple gunshot wounds (twenty-three entrance and exit wounds), several at a range of less than 24 inches. *Page 33 
 {¶ 130} Construing the evidence in a light most favorable to the prosecution, a reasonable jury could have found Appellant guilty beyond a reasonable doubt of the aggravated murder of Travon Barrino. The Supreme Court of Ohio has previously held that "a defendant's threat to obtain a weapon and kill his victim and his later actions carrying out the threat are enough to prove prior calculation and design. State v.Sowell (1988), 39 Ohio St.3d 322, 333, 530 N.E.2d 1294; see, also,State v. Toth (1977), 52 Ohio St.2d 206, 213, 6 O.O.3d 461,371 N.E.2d 831; State v. Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 80-84. Pursuit of a wounded, helpless victim also has been held to be evidence of prior calculation and design. See, e.g., State v.Robbins (1979), 58 Ohio St.2d 74, 78-79, 12 O.O.3d 84, 388 N.E.2d 755
(defendant obtained a weapon from his apartment after fighting with victim in hallway, returned to hallway, and stabbed wounded, helpless victim to death); State v. Claytor (1991), 61 Ohio St.3d 234, 241,574 N.E.2d 472 (defendant pursued wounded victim and shot him in the face);State v. Cotton, 56 Ohio St.2d at 9-10, 10 O.O.3d 4, 381 N.E.2d 190
(defendant wounded first police officer and, after shooting second officer, returned to kill first officer, who was trying to crawl away)."State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 45.
 {¶ 131} Furthermore, Appellant's confession found in his notebook rap lyrics that "you started runnin like you was close to kin to Marion Jones. I don't know how you losin' weight when these bullets sticc to yo bones . . . It's fucced up I gotta put this thru yo head . . ." mirrors the wounds inflicted on Travon Barrino.
 {¶ 132} Regarding Appellant's convictions for improper discharge of a firearm at or into a habitation, the state need only prove that Appellant knowingly discharged a *Page 34 
firearm at or into an occupied structure that is a permanent or temporary habitation or dwelling of another. Jamie Dugger, who resided at 1603 Yale Avenue, testified that she did not give Appellant permission to shoot a firearm into her home. Tina Johnson, who resided at 3125 Kalahari Street testified similarly, as did Margaret Wilson of 3023 Bollinger Avenue, Beverly Gadison of 3017 Bollinger Avenue, and Jeanna Jackson, of 1429 Vienna Road.
 {¶ 133} Appellant specifically claims that because the only witness to all of these crimes was Kayla Auman, the convictions cannot stand. We would note, initially, that Ohio courts have held that the testimony of one witness, if believed by the jury, is sufficient to support a conviction. The issue of witness credibility is a matter within the province of the jury. State v. Jamison (1990), 49 Ohio St.3d 182.
 {¶ 134} The jury was instructed on the testimony of Kayla Auman. Specifically, the court told the jury, "You have heard the testimony from Kayla Auman, a person who pled guilty to a crime involving the same facts as in this case and is said to be an accomplice. An accomplice is one who knowingly joins another in the commission of a crime. Whether Kayla Auman was an accomplice and the weight to give her testimony are matters for you to determine from all the facts and circumstances in evidence. The testimony of an accomplice does not become inadmissible because of her complicity, moral turpitude or self-interest. But the admitted or claimed complicity of a witness may affect her credibility and make her testimony subject to grave suspicion and require that it be weighed with great caution.
 {¶ 135} "It is for you as jurors in light of all of the facts presented to you and from the witness stand to evaluate such testimony and determine its quality and worth or its *Page 35 
lack of quality and worth. An accomplice may have special motives in testifying and you should carefully examine an accomplice's testimony and use it with great caution and view it with grave suspicion."
 {¶ 136} While certainly Kayla Auman's testimony was critical to the prosecution's case, it was not the only evidence linking Appellant to the crime spree that he orchestrated. Jamie Dugger testified that she was 99% certain that Appellant was the person shooting at her house and that the driver of the car was Kayla Auman. Ballistics evidence proved that the same two firearms, a Hi-Point and a Ruger, were used in all of the shootings and in the murder of Travon Barrino.
 {¶ 137} Moreover, Appellant's own statements in his rap lyrics and his letter to "Eltin John" where he instructed someone how to kill critical witnesses to his crimes are clear indications of his guilt.
 {¶ 138} Regarding Appellant's manifest weight challenge, we turn to whether the State has met its burden of persuasion. State v.Thompkins (1997), 78 Ohio St.3d 380, 390, 678 N.E.2d 541. When reviewing the manifest weight of the evidence, this court examines the entire record, weighs the evidence, and considers the credibility of the witnesses. We sit as a "thirteenth juror" and may reverse the judgment of conviction if it appears that the jury, in resolving conflicts in the evidence, "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins at 387. A court should reverse a conviction as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." Id. *Page 36 
 {¶ 139} This is not that exceptional case. To convict Appellant of aggravated murder, the State had to prove that Appellant, with prior calculation and design, purposely caused the death of Travon Barrino. To convict Appellant of the five counts of improper discharge, the State had to prove that Appellant knowingly shot a firearm at or into an occupied structure that was the permanent or temporary dwelling of another. In light of the testimony already discussed, the jury was free to believe all, part, or none of Kayla Auman's testimony and to determine the credibility of other witnesses, including Criminalist Short, who Appellant claims mixed up the name of the guns used in the crimes.
 {¶ 140} The jury was well aware of Kayla Auman's inconsistent statements to police officers and they were instructed to view her testimony with grave suspicion. Ultimately, the jury chose to believe Auman and to find that the myriad of evidence presented by the State met that burden of persuasion.
 {¶ 141} Accordingly, Appellant's convictions are not against the manifest weight of the evidence and are supported by sufficient evidence. Appellant's fourth assignment of error is overruled.
 V. {¶ 142} In his fifth assignment of error, Appellant alleges that he was denied the right to a fair trial based on prosecutorial misconduct. We disagree.
 {¶ 143} The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. State v. Lott (1990), 51 Ohio St.3d 160, 555 N.E.2d 293, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591, *Page 37 112 L.Ed.2d 596. In reviewing allegations of prosecutorial misconduct, we must review the complained of conduct in the context of the entire trial. Darden v. Wainwright (1986), 477 U.S. 168, 106 S.Ct. 2464,91 L.Ed.2d 144.
 {¶ 144} "* * * [T]he prosecution is entitled to a certain degree of latitude in summation, * * *" State v. Liberatore (1982),69 Ohio St.2d 583, 589, 433 N.E.2d 561, 566. Indeed, "[i]n the tension and turmoil of a trial, both the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Stephens (1970),24 Ohio St.2d 76, 82, 263 N.E.2d 773, 777.
 {¶ 145} Given the numerous safeguards in place to assure a fair trial, "and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial. * * * [Citations omitted.]" * * * [I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless including most constitutional violations." United States v.Hasting (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 1980,76 L.Ed.2d 96, certiorari denied (1985), 469 U.S. 1218, 105 S.Ct. 1199,84 L.Ed.2d 343.
 {¶ 146} Appellant specifically claims that one statement made during the prosecutor's opening statement and two statements made during closing arguments prejudiced Appellant and deprived him of a right to a fair trial.[6] First, Appellant claims *Page 38 
that the prosecutor's comment in opening statement, "That because of his knowing acts, because of his conduct, this man as he sits before you today is guilty just as he is charged in this indictment."[7]
 {¶ 147} Trial counsel objected to this statement and a conference was held at the bench, wherein counsel argued that the state inappropriately commented on the presumption of innocence. The prosecutor, in response, stated that he was merely stating what he believed the evidence will show. We find, that when viewed in context, the statement does reflect what the prosecutor believed that the evidence would show, and was not in error. The trial court, as a cautionary measure, proceeded to give a curative instruction, which stated, "Ladies and gentlemen, I will just once again remind you that opening statement is not evidence. It's an outline by the attorneys on what they believe the evidence will be. Also remind you that the burden is on the prosecution to prove beyond a reasonable doubt each and every element of the offense that the Defendant is charged with, but as he sits here today, he is presumed to be innocent. So Mr. Vance's comment regarding his belief that the Defendant is guilty is merely his opinion. I want to make that by way of a curative instruction. Very well."
 {¶ 148} Appellant additionally challenges two statements made by the prosecutor in closing argument.[8] Specifically, Appellant claims that the prosecutor's statement, when referring to Criminalist Short's testimony, "and I know it was long and tedious, but it was long and tedious because Montel Dunn decided to drive all over the City of *Page 39 
Canton and shoot houses and murder people," denied him the right to a fair trial. Trial counsel objected to this statement and the trial court gave a curative instruction, telling the jurors, "Ladies and gentlement, you are instructed to disregard Mr. Barr's reference to more than one person that Mr. Dunn. . . . Montel Dunn driving around the city and murdering people is to be disregarded. There is not an allegation in this case that he murdered people. There is only one allegation and that's with respect to Travon Barrino. Mr. Barr, you may continue."
 {¶ 149} Appellant also claims that the prosecutor's statement, "And then he goes on to say, `I don't even talk to mu-fuccas in here because I don't know who working for the police thinking that they get cool with a nigga that I will just confess to that murda, they got me fucked up. Remaining silent will set me free.' So he knows enough to keep his mouth shut in the jail and not talk to anybody else. Innocent people don't worry about that." Trial counsel objected to this statement, but the objection was overruled by the court. The court offered to give a curative instruction, but trial counsel declined the instruction, stating, "I will leave it as it is."
 {¶ 150} Additionally, the trial court, in its general instructions to the jury, stated, "The evidence does not include the indictment, voir dire, opening statements and closing arguments of counsel. The opening statements and closing arguments are merely designed to assist you in understanding the evidence and law. They are not evidence." We presume that jurors follow a court's instructions. State v. Noling,98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 39. *Page 40 
 {¶ 151} Viewing these three isolated statements in the context of the whole trial, we cannot find that Appellant's rights were substantially prejudiced and that he did not receive a fair trial. Accordingly, Appellant's fifth assignment of error is overruled.
 {¶ 152} For the foregoing reasons, we find Appellant's assignments of error to be without merit and we therefore overrule them. The judgment of the Stark County Court of Common Pleas is affirmed.
By: Delaney, J., Edwards, J. and Hoffman, P.J. concurs separately
[1] The location of where these casings were recovered from is not clear from the record. During testimony, Criminalist Short testified that these casings were recovered from the Bollinger Avenue shooting. When seeking to admit Exhibits 1A and 1B, however, the prosecutor stated that the casings were retrieved from 1603 Yale Avenue.
[2] The Court observes that Appellant's brief exceeds the maximum page limit by six pages. While typically, we would strike the last six pages of Appellant's brief, because this error was not brought to the court's attention until after oral argument, the court will consider all of Appellant's assignments of error, but would caution Appellant to comply with the rules in future briefs, having now been put on notice of the rule.
[3] Appellant claims that the evidence by Criminalist Short was "contradictory"; however he does not support this claim with any proof. We find Appellant's claim to be unsupported by the evidence.
[4] Appellant does not mention the two counts of improper discharge of a firearm into a habitation that occurred on January 16, 2008, in this assignment of error.
[5] The State appears to concede that this evidence was offered under 404(B). We are not convinced that it was, but since the State appears to concede the point, we will address the issue under a 404(B) analysis.
[6] Appellant also makes a claim that "the prosecutor failed to act in good faith in challenging the fact that the pants submitted to the crime lab were not worn by the victim at the time of the shooting. The State had already entered this item into evidence as the victim's clothing when he was shot. A prosecutor may not, by a question, assert the truth of an unproved allegation which is substantially harmful to a defendant, and upon receiving a negative reply, fail to produce evidence thereof. It is unprofessional for a prosecutor to ask a question, which implies the existence of a fact which he cannot support by evidence." We cannot discern what counsel is referring to by these ambiguous statements as he does not cite to any place in the record where an alleged error occurred, nor does he explain how these statements amount to prosecutorial misconduct. Accordingly, we decline to address this statement based on counsel's convoluted allegation.
[7] Appellant fails to cite to a specific place in the record where the prosecutor stated "this man as he sits before you today is guilty," as required by App. R. 16(A)(7); however, we presume that he is referring to the comment referenced by this court above at 5/28/08 Tr. P.26.
[8] Again, Appellant fails to comply with App. R. 16 and does not reference where in the record these alleged errors are found. *Page 41