[Cite as *State v. Chester*, 2021-Ohio-918.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2020CA00028 |
| | : | |
| TAVIST CHESTER | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of
                             Common Pleas, Case No.
                             2019CR0977B

JUDGMENT:                    AFFIRMED

DATE OF JUDGMENT ENTRY:      March 22, 2021

APPEARANCES:

For Plaintiff-Appellee:                    For Defendant-Appellant:

KYLE STONE                                 KELLY S. MURRAY
STARK CO. PROSECUTOR                       116 Cleveland Ave. NW, Ste. 600
KATHLEEN O. TATARSKY                       Canton, OH 44702
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

*Delaney, J.*

{¶1} Appellant Tavist Chester appeals from the March 4, 2020 Judgment Entry of the Stark County Court of Common Pleas. Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2} This case arose in the early-morning hours of May 12, 2019, when appellant shot and killed Nigel Jackson outside the R Bar in Canton, Ohio. The following evidence is adduced from the record of appellant's jury trial.

*Scene of shooting at the R Bar: suspect is identified*

{¶3} Ptl. Vincent Romanin worked midnight shift with the Canton Police Department when he was dispatched to the R Bar at 1117 Wertz Avenue Northwest around 12:44 a.m. on May 12, 2019 for a shooting casualty. Upon arrival at the bar, Romanin found a chaotic scene outside with a crowd surrounding one man on the ground, unresponsive. Romanin observed the aftermath of what appeared to have been a shootout. Many shell casings were scattered in the parking lot and several parked cars sustained damage from gunshots.

{¶4} Someone at the scene showed Romanin footage from a bar security camera. On the video, a silver late-model Dodge Ram pickup truck pulled up to the front of the bar. Romanin recognized this vehicle from an incident he was involved in months earlier: an exchange of gunfire occurred between vehicles on Interstate 77 in Canton. Someone at the bar provided appellant's name, and Romanin checked for vehicles registered to appellant. One was a silver Dodge Ram pickup truck. Romanin forwarded this information to detectives.

{¶5} Sgt. Scott Prince investigated the shooting incident and learned the silver Dodge Ram at the crime scene was associated with appellant. Prince found the vehicle parked at appellant's residence. Prince knocked and appellant came to the door; Prince said only, "You know why I'm here. We need to talk." Prince asked appellant if the gun was still in the house, and appellant said no. Appellant gave consent to search the house, and no gun was found. Appellant was transported to Canton Police Department and interviewed by Prince and two other detectives.

*Security camera footage*

{¶6} Appellee presented videotape evidence from the bar to illustrate events leading up to the shooting. The evidence consisted of shots from multiple cameras and multiple perspectives. Appellant entered the bar with his cousins Courtney Compton and Jordan Smalls. Appellant and the women were inside the bar for only a short time when suddenly, unprovoked, Nigel Jackson struck appellant in the back of the head without warning.

{¶7} Appellant and his cousins ran from the bar. Jackson and Antonio Wallace exited the bar, and Jackson physically reacted as he was shot, crumpling to the ground. Wallace held a gun in his right hand and raised it. Appellant ran beside his truck, firing two shots. The video also shows two muzzle blasts from the door of the bar, later determined to have been fired by bar manager Joshua Moore.

{¶8} None of the weapons fired by any of the three individuals that night was recovered. Numerous shell casings were found of three separate calibers: .40, .45, and .380. Two bullets fragmented in Jackson's body; one entered his lungs and severed his spinal cord, but remained intact. The bullets which struck and killed Jackson were .40-

caliber Smith & Wesson shells, copper-nosed bullets identical to those found under appellant's bed during the consent search of his residence.

{¶9} The remainder of the trial consisted of witnesses filling in their versions of the events captured on the bar security videos.

*The bar manager throws patrons out and fires gun into the air*

{¶10} Joshua Moore is a manager of the R Bar. On the weekend of May 11, the bar sponsored a Mother's Day event and was crowded. Moore worked the door, collecting cover charges, patting down patrons, and checking women's purses. He became aware that one of the bar's bouncers, "Franco," was attempting to break up a fight between appellant and Nigel Jackson. Moore grabbed Jackson; Jackson swung at him; and the two started to fight. Moore heard someone yell, "Get off my boy," and realized it was Antonio Wallace, with a gun in his hand. Moore told Wallace and Jackson to get out of the bar, along with a third unidentified man. Wallace, Jackson, and their unidentified companion backed out of the bar, "jawing" with Moore as they left through the front door.

{¶11} Moore's eyes stayed on Wallace because Wallace had a gun in his right hand, his arms at his sides. When Wallace and Jackson reached the front of the bar, shooting started from the parking lot. Jackson crumpled and fell. Wallace dropped and tried to run. Moore either retrieved the "bar gun" himself, or asked another bouncer to retrieve it for him, and fired two shots into the air.

{¶12} Moore testified that when he heard the first shots ring out, Wallace's hands were still at his sides because he was still engaged with Moore. Moore saw Jackson fall to the ground before Wallace started shooting. Moore was the third and final shooter; his

purpose in firing into the air was to scare people away from the scene. Several people in the crowd called 911. When police arrived on the scene, Moore retrieved the bar security video to show them. The "bar gun" he fired into the air was never turned over, however. Moore described the "bar gun" as a .45 caliber Taurus.

*Bouncer hears shots, sees Jackson fall, then Wallace fires*

{¶13} Samuel "Franco" Jamerson was the bouncer on duty with Moore that night. He was familiar with appellant and his cousins, and also with Wallace and Jackson. Wallace is a "regular" at the R Bar and generally sits on the patio, smoking with his "crew." That night, Jackson went in and out of the bar several times. Upon appellant's arrival, Franco chatted with him and his cousins, then sat down and turned away briefly. He was surprised to see Jackson come up behind appellant and "sucker-punch" him in the back of the head. Franco ran to grab Jackson, but not before Compton and Smalls jumped on him in defense of appellant.

{¶14} Franco grabbed appellant and pulled him toward the door of the bar. Joshua Moore came up and asked what happened. Franco told appellant he had to leave; appellant said "no problem" and ran toward the parking lot. Compton and Smalls also ran out of the bar shortly behind appellant. As Franco dealt with appellant, Jackson punched Moore, and Jackson and Moore began to fight. Wallace came up and told Moore something to the effect of, "Get the fuck off my boy." Wallace had a gun in his right hand, although his arms were at his sides. Wallace, Jackson, and another man walked to the door and Moore said they all had to get out.

{¶15} The three went out the door and Franco heard "boom, boom, boom." Franco watched Wallace, whose hands were still at his sides, pistol in hand. Jackson

slowly dropped to the ground as Franco and Wallace also ducked. Due to the way Jackson crumpled, Franco surmised he was shot. Wallace raised his pistol and fired back.

{¶16} To Franco, it sounded like many rounds were fired. Franco was armed, but he did not shoot because he didn't know where the shots were coming from. Franco ran back into the bar, shut the door, and told panicked patrons to exit out the back door. Wallace came back into the bar and pointed his weapon at Moore. Franco said, "You don't want to do that," and Wallace lowered the gun and ran back out the front door.

{¶17} Franco was the only participant in the night's events who voluntarily turned over his firearm to police, even though he didn't fire it that night and was not one of the shooters. At trial, Franco speculated that even though bar patrons were patted down and searched upon entering, Wallace could have obtained his pistol through the slats in the fence around the patio, which had been a problem in the past. Franco unequivocally testified that Wallace fired his gun after the first shots were fired in his direction from the parking lot and after Jackson had already been hit.

*Jackson killed by copper-nosed Inceptor bullet*

{¶18} A deputy medical examiner performed an autopsy on Jackson and found he had three gunshot entrance wounds. Two were nonfatal, one to the right corner of his mouth and one to his left upper arm. The bullets from both of those shots fragmented, or broke apart, and the medical examiner retrieved portions of copper-nosed bullets from the wounds. The third shot was a gunshot wound to Jackson's right chest which penetrated his lung and severed his spinal cord. This projectile was retrieved intact, also a copper-nosed bullet. This wound was fatal.

{¶19} Appellee's firearms expert testified that six .380 caliber shell casings were discovered at the scene, all fired from the same weapon. Police also found two .45 caliber shell casings, both fired from a second gun. Finally, several .40 caliber shell casings were found, including one in the bed of appellant's truck. All of the .40 caliber shell casings were fired from the same weapon, although some of the shells were of different brands. No firearms were recovered from the scene.

{¶20} During the consent search of appellant's residence, an ammunition box was found under his bed for .40 caliber Inceptor brand shells. Inside the box were six .40 caliber Smith & Wesson shells manufactured by Blazer, one of the brands of .40 caliber shell casings found at the scene. The intact bullet and bullet fragments recovered from Jackson's body were unique copper-nosed bullets manufactured by Inceptor for .40 caliber firearms.

*Appellant's testimony: in fear for his life of Antonio Wallace*

{¶21} Appellant testified on his own behalf at trial. He said in February 2019, an incident occurred with Antonio Wallace at a different bar which ended with someone shooting at appellant's truck on Interstate 77 in Canton. A passenger in appellant's vehicle shot back. Appellant testified this incident led to several months of vague threats on behalf of Antonio Wallace, leading appellant to fear for his life. Appellant started carrying a gun, a Smith & Wesson .40 caliber, on his mail route and kept an AK-47 hidden in his truck.

{¶22} On the evening of May 11, 2019, appellant went out with his cousins Compton and Smalls. Compton drove the three in appellant's truck to the R Bar. Appellant secreted his handgun on top of a tire in the wheel well of the parked truck while

he went into the bar. The three entered the bar and were talking with Franco when appellant was suddenly struck from behind on the head. Appellant did not know Nigel Jackson and never saw him before. He thought Antonio Wallace struck him, although he testified he didn't see Wallace in the bar.

{¶23} Appellant ran out of the bar because he wanted to get away. He screamed to his cousins to run, too. Appellant arrived at the truck first, grabbed his weapon from the tire, but couldn't open the door because Compton had the keys. Rather than wait for his cousins who were shortly behind him, appellant ran back toward the bar parking lot because he claimed he thought he would be "safer" there. He knew the bar had security cameras. Appellant saw Wallace in front of the bar with a gun in his hand. Appellant claimed he saw Wallace point the gun in his direction, so appellant raised his own gun and immediately started shooting. Appellant later told police he "emptied his clip." He then ran away through some backyards, called Compton, and was picked up in his truck. Appellant claimed he didn't know anyone was shot until police told him he would be charged with murder. Appellant feared for his life because of Wallace and testified he does not believe he shot Jackson. He never saw anyone fall when shots were fired but doesn't know how many rounds he fired; he "was just squeezing."

{¶24} Upon cross examination, appellant said he saw Wallace outside the bar and thought Wallace was the person who hit him. He could not have left immediately after being punched because he had to retrieve his cousins from the bar. When he got to the truck, he couldn't get in and didn't see his cousins coming so he ran back to the parking lot. Appellant acknowledged he was likely to harm someone by pointing his gun at a

group of people and firing, but claimed he only fired because someone was trying to hurt him.

*Appellant's cousin didn't see shots fired*

{¶25} Courtney Compton, appellant's cousin, testified on his behalf. She acknowledged she had the truck keys in her purse and said she and Smalls drove the truck back toward the bar looking for appellant but didn't see him. They heard shots but didn't see appellant and were afraid he was on the ground, dead. Appellant then called her and she picked him up a few blocks away from the bar. Compton's sister was inside the bar and called her to ask if everyone was O.K. because someone outside the bar was dead. Appellant didn't tell her he shot at anyone. He did, however, bring an AK-47 to her house after the shooting and asked her to keep it for him.

*Indictment, trial, conviction and sentence*

{¶26} Appellant was charged by indictment with one count of aggravated murder pursuant to R.C. 2903.01(A) [Count I]; one count of murder pursuant to R.C. 2903.02(A) and/or (B) [Count II]; and three counts of felonious assault pursuant to R.C. 2903.11(A)(1) and/or (A)(2) [Counts III, IV, and V]. Each count was accompanied by a firearm specification pursuant to R.C. 2941.145.

{¶27} Appellant entered pleas of not guilty and the matter proceeded to trial by jury. Appellant was found not guilty upon Count I, aggravated murder, and guilty upon the remaining counts of murder and felonious assault. The trial court sentenced appellant to an indefinite prison term of 23 to 24 years to life.

{¶28} Appellant now appeals from the trial court's judgment entry of conviction and sentence.

{¶29} Appellant raises three assignments of error:

**ASSIGNMENTS OF ERROR**

{¶30} "I. THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶31} "II. THE VERDICT IS INSUFFICIENT AS A MATTER OF LAW."

{¶32} "III. THE TRIAL COURT'S SENTENCING WAS IN ERROR, DEPRIVING APPELLANT OF HIS CONSTITUTIONAL RIGHTS."

**ANALYSIS**

I., II.

{¶33} Appellant's first and second assignments of error are related and will be considered together. Appellant argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶34} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶35} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶36} Appellant was found guilty upon one count of murder pursuant to R.C. 2903.02(A) and/or (B). Appellee was therefore required to prove that appellant purposely caused the death of Nigel Jackson, and/or caused Jackson's death as a proximate result of committing or attempting to commit felonious assault.

{¶37} Appellee's case against appellant is largely circumstantial. Ohio law recognizes that circumstantial evidence is sufficient to prove the essential elements in a criminal case. *State v. Scott*, 5th Dist. Morgan No. 06 CA 1, 2007-Ohio-303, ¶ 35, citing *State v. Willey*, 5th Dist. Guernsey No. 98 CA 6, unreported, 1999 WL 3962 (Nov. 24, 1998), internal citation omitted. "The only notable exception to this principle is where the inference between the facts proven and the facts sought to be proven is so attenuated that no reasonable mind could find proof beyond a reasonable doubt." *Id.*, citing *State v. Griffin*, 13 Ohio App.3d 376, 377-378, 469 N.E.2d 1329 (1st Dist.1979).

{¶38} If the state relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "such evidence to be irreconcilable with any

reasonable theory of innocence in order to support a conviction." *State v. Granados*, 5th Dist. Fairfield No. 13-CA-50, 2014-Ohio-1758, ¶ 27, citing *Jenks*, *supra*, 61 Ohio St.3d at 272, paragraph one of the syllabus. "Circumstantial evidence and direct evidence inherently possess the same probative value [.]" *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that i[t] weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492. While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293 (1990), citing *Hurt v. Charles J. Rogers Transp. Co*, 164 Ohio St. 329, 331, 130 N.E.2d 820 (1955). Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. *Lott*, 51 Ohio St.3d at 168, citing *Hurt*, 164 Ohio St. at 331.

{¶39} Piecing together the evidence of the videos with the testimony of the witnesses, it is evident appellant initiated the shootout. Appellant stowed a loaded gun in an accessible location—his truck tire well—before he entered a crowded bar. Despite what he described as months of menacing by Wallace, appellant and his cousins chose the bar where Wallace and his "crew" were regulars. Appellant was sucker-punched in the bar shortly after arrival and assumed Wallace was the perpetrator. After leaving the bar and going to his truck, appellant did not leave the scene; instead, he retrieved his firearm and returned to the bar parking lot. Appellant does not dispute firing his weapon in the direction of the perceived threat: Antonio Wallace, Nigel Jackson, and the

unidentified third man. Appellant told police he "emptied the clip;" he didn't know how many times he fired but he "just kept squeezing." Appellant was the only known shooter who used a .40-caliber firearm that night. Twelve .40-caliber shell casings fired from the same gun were found around the scene in the aftermath, including one in the bed of appellant's truck.

{¶40} Moore testified he heard shots from the parking lot, saw Jackson start to crumple to the ground, and Wallace still had his hands at his sides. The testimony of one witness, if believed by the factfinder, is enough to support a conviction. See, *State v. Dunn*, 5th Dist. Stark No. 2008-CA-00137, 2009-Ohio-1688, ¶ 133. The video surveillance also corroborated Moore's recollection; Jackson collapsed to his knee before Wallace raised his weapon, and before Moore fired two shots from the door of the bar. Franco also testified Wallace raised his arm after shots were fired from the parking lot.

{¶41} The autopsy provided further evidence appellant killed Jackson. The deputy medical examiner testified that he found fragments of copper-nosed bullets, and one almost-intact copper-nosed bullet, in Jackson's body. The intact copper-nosed bullet was the fatal shot. Appellee's firearms expert testified that only .40-caliber Inceptor bullets are copper-nosed. Appellant was the only shooter that night to fire a .40-caliber weapon, and an Inceptor ammunition box was found under his bed during the consent search.

{¶42} We defer to the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), at paragraph one of the syllabus. The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witnesses'

credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Johnson*, 2015-Ohio-3113, 41 N.E.3d 104, ¶ 61 (5th Dist.), citing *State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). The jury need not believe all of a witness' testimony, but may accept only portions of it as true. Id.

{¶43} Any inconsistencies in the evidence were for the trial court to resolve. *State v. Dotson*, 5th Dist. Stark No. 2016CA00199, 2017-Ohio-5565, ¶ 49. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." *State v. Delevie*, 5th Dist. Licking No. 18-CA-111, 2019-Ohio-3563, ¶ 30, appeal not allowed, 158 Ohio St.3d 1410, 2020-Ohio-518, 139 N.E.3d 927, citing *State v. Brindley*, 10th Dist. Franklin No. 01AP-926, 2002-Ohio-2425, 2002 WL 1013033, ¶ 16.

{¶44} Appellant further argues appellee failed to prove he did not act in self-defense. R.C. 2901.05 provides in relevant part:

> (A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense other than self-defense * * * is upon the accused.
>
> (B)(1) A person is allowed to act in self-defense * * *. If, at the trial of a person who is accused of an offense that involved the person's use

of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * * as the case may be.

* * * *.

(4) The presumption set forth in division (B)(2) of this section is a rebuttable presumption and may be rebutted by a preponderance of the evidence, provided that the prosecution's burden of proof remains proof beyond a reasonable doubt as described in divisions (A) and (B)(1) of this section.

{¶45} In the instant case, the jury was instructed as follows:

* * * *.

The Defendant is allowed to use force in self-defense. Evidence was presented that, if believed by you, tends to support a finding that the Defendant used deadly force in self-defense. In order to prove that the Defendant did not act in self-defense, the State must prove beyond a reasonable doubt at least one of the following:

A. The Defendant was at fault in creating the situation giving rise to the death of Nigel Jackson;

Or B. The Defendant did not have reasonable grounds to believe and an honest belief, even if mistaken that he was in imminent or immediate danger of death or great bodily harm;

Or C. The Defendant violated a duty to retreat or escape to avoid the danger; or

D. The Defendant did not use reasonable force.

* * * *.

At Fault: The Defendant did not act in self-defense if the State proved beyond a reasonable doubt that the Defendant was at fault in creating the situation that resulted in the death. The Defendant was at fault if the Defendant was the initial aggressor and

A. Nigel Jackson and/or Antonio Wallace did not escalate the situation to deadly force;

Or B. The Defendant provoked Nigel Jackson and/o Antonio Wallace into using force;

Or C. The Defendant did not withdraw from the situation;

Or D. The Defendant withdrew from the situation but did not reasonably indicate his withdrawal by words or acts to Nigel Jackson and/or Antonio Wallace.

* * * *.

Duty to Retreat: The Defendant has a duty to retreat if he:

A, was at fault in creating the situation giving rise to the death of Nigel Jackson;

Or B. Did not have reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm;

Or C. Had a reasonable means of escape from that danger other than by the use of deadly force.

* * * *.

T. IV., 103-107.

{¶46} Appellant had multiple opportunities to escape the situation giving rise to the danger and not only failed to do so, but escalated the danger. After he was sucker-punched by Jackson, he left the bar and went to his truck. He claimed he couldn't open the door and had no choice but to grab his gun from the wheel well and return to the bar parking lot, actions that defy logic if he sought to avoid the threat of Wallace. Compton was right behind appellant with the truck keys, but he took the gun, ran back to the parking lot, and shot at Jackson, Wallace, and John Doe. We further note that despite alleged months of threats from Wallace, appellant went to the bar with the loaded firearm he secreted in the wheel well and a loaded AK-47 under the seat. As demonstrated at trial, appellant had several options other than returning to the parking lot and killing Jackson. He could have run to the Speedway across the street, or taken cover behind or inside the truck, or run down the road. In short, appellant had no defensible reason to return to the parking lot and empty his weapon in the direction of Jackson, killing him. Appellee's evidence was compelling, and the jury was free to weigh appellant's self-serving testimony of self-defense accordingly. *State v. Spiess*, 5th Dist. Licking No. 19-CA-106, 2020-Ohio-4376, ¶ 27.

{¶47} Viewing the evidence in the light most favorable to appellee, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant was guilty of murder and felonious assault. A reasonable person could further find, beyond a

reasonable doubt, that appellant did not act in self-defense. We hold, therefore, that appellee met its burden of production regarding every element of the crimes and, accordingly, there was sufficient evidence to support appellant's convictions.

{¶48} The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. *State v. Zachery*, 5th Dist. Stark No. 2008-CA-00187, 2009-Ohio-715 at ¶ 36. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *Id.*, citing *State v. Craig*, 10th Dist. Franklin No. 99AP-739, unreported, 2000 WL 297252 (Mar. 23, 2000), internal citation omitted.

{¶49} Appellant's first and second assignments of error are overruled.

III.

{¶50} In his third assignment of error, appellant argues the trial court erred in sentencing him to consecutive terms upon two counts of felonious assault, and that those felonious assault counts should have merged. Appellant further summarily challenges the constitutionality of R.C. 2967.271. For the following reasons, we disagree with appellant's arguments.

{¶51} Appellant first argues that Counts IV and V, felonious assault against Antonio Wallace and John Doe, are allied offenses of similar import which should have merged for sentencing. R.C. 2941.25, Ohio's allied-offense statute, provides:

> (A) Where the same conduct by defendant can be construed
> to constitute two or more allied offenses of similar import, the

indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶52} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, syllabus, the Supreme Court of Ohio held the following:

1. In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import.

2. Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

3. Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were

committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

{¶53} The *Ruff* court explained at paragraph 26:

At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

{¶54} In the instant case, appellant was convicted upon one count of the murder of Nigel Jackson and three counts of felonious assault against Jackson, Antonio Wallace, and the unidentified John Doe who accompanied them. The trial court merged the murder and felonious assault convictions on behalf of Jackson but found the felonious assault counts on behalf of Wallace and Doe represented separate victims and therefore did not merge. Appellant was ordered to serve a consecutive term of two years plus a mandatory

three-year term for the firearm specification on behalf of each, to be served concurrently with each other. The trial court was not required to merge all of the counts of felonious assault because the counts represented separate victims and separate harms. *Ruff*, supra, at paragraph two of the syllabus. Appellant was therefore properly convicted of, and sentenced upon, separate counts.

{¶55} Appellant summarily argues the trial court erred in imposing consecutive terms. "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 16 N.E.3d 659, 2014-Ohio-3177, syllabus.

{¶56} In Ohio, there is a statutory presumption in favor of concurrent sentences for most felony offenses. R.C. 2929.41(A). The trial court may overcome this presumption by making the statutory, enumerated findings set forth in R.C. 2929.14(C)(4). *Bonnell*, supra, 2014-Ohio-3177 at ¶ 23. R.C. 2929.14(C)(4) concerns the imposition of consecutive sentences and provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and

to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶57} In this case, the record does establish the trial court made the findings required by R.C. 2929.14(C)(4)(b) at the time it imposed consecutive sentences. In the sentencing entry and on the record at the sentencing hearing, the trial court found that consecutive sentences are necessary to protect the public from future crime or to punish the offender; are not disproportionate to appellant's conduct and to the danger he poses to the public; and at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so

great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct would adequately reflect the seriousness of appellant's conduct.

{¶58} Based on our review, we find that the record demonstrates that the trial court made the requisite findings and those findings are supported by the record. The sentence was within the statutory range. Moreover, the record reveals that the trial court properly considered the statutory purposes and factors of felony sentencing, and the decision is supported by clear and convincing evidence.

{¶59} Finally, appellant summarily challenges the presumptive release feature of R.C. 2967.271, arguing it violates his constitutional rights to trial by jury and due process of law, and further violates the constitutional requirement of separation of powers. We note appellant did not raise the constitutionality of R.C. 2967.271 before the trial court and has not argued defense trial counsel was ineffective in failing to do so. We addressed the concept of ripeness for review in regard to the Regan Tokes Act in *State v. Downard*, 5th Dist. Muskingum, CT2019, 2020-Ohio-4227, appeal allowed, 160 Ohio St.3d 1507, 2020-Ohio-6835, 159 N.E.3d 1152:

> The Ohio Supreme Court discussed the concept of ripeness
> for review in *State ex rel. Elyria Foundry Co. v. Indus. Comm.*, 82
> Ohio St.3d 88, 1998-Ohio-366, 694 N.E.2d 459:
>
> > Ripeness "is peculiarly a question of timing." *Regional Rail*
> > *Reorganization Act Cases* (1974), 419 U.S. 102, 140, 95 S.Ct. 335,
> > 357, 42 L.Ed.2d 320, 351. The ripeness doctrine is motivated in part
> > by the desire "to prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies * * *." *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691. As one writer has observed:

The basic principle of ripeness may be derived from the conclusion that 'judicial machinery should be conserved for problems which are real or present and imminent, not squandered on problems which are abstract or hypothetical or remote.' * * * [T]he prerequisite of ripeness is a limitation on jurisdiction that is nevertheless basically optimistic as regards the prospects of a day in court: the time for judicial relief is simply not yet arrived, even though the alleged action of the defendant  foretells legal injury  to the plaintiff. Comment, *Mootness and Ripeness: The Postman Always Rings Twice* (1965), 65 Colum. L.Rev. 867, 876. Id. at 89, 694 N.E.2d at 460.

In *State v. McCann*, 8th Dist. Cuyahoga No. 85657, 2006-Ohio-171, the defendant argued because the Parole Board, pursuant to R.C. 2967.28, could extend his sentence by up to an additional five years for violation of post-release control, the statute was unconstitutional. The Eighth District Court of Appeals concluded because McCann was not currently the subject of such action by the Parole Board, the issue was not yet ripe for review. *Id.* at ¶6.

Likewise, in the instant case, while R.C. 2967.271 allows the DRC to rebut the presumption Appellant will be released after serving

his nine-year minimum sentence and potentially continue his incarceration to a term not exceeding thirteen years, Appellant has not yet been subject to such action by the DRC, and thus the constitutional issue is not yet ripe for our review.

*State v. Downard*, 5th Dist. Muskingum, CT2019, 2020-Ohio-4227, supra, ¶ 8-11, appeal allowed, 160 Ohio St.3d 1507, 2020-Ohio-6835, 159 N.E.3d 1152; see also, *State v. Buckner*, 5th Dist. Muskingum Nos. CT2020-0023 & CT2020-0024, 2020-Ohio-7017; *State v. Wolfe*, 5th Dist. Licking No. 2020CA00021, 2020-Ohio-5501; *State v. Cochran*, 5th Dist. Licking No. 2019 CA 00122, 2020-Ohio-5329; *State v. Clark*, 5th Dist. Licking No. 2020 CA 00017, 2020-Ohio-5013; *State v. Manion*, 5th Dist. Tuscarawas No. 2020 AP 03 0009, 2020-Ohio-4230; *State v. Kibler*, 5th Dist. Muskingum No. CT2020-0026, 2020-Ohio-4631.

{¶60} Appellant does not dispute he is not yet subject to the provisions of R.C. 2967.271. We therefore find here, as we did in *Downard*, that his constitutional challenge is not yet ripe for review.

{¶61} We find no error in the trial court's sentence. Appellant's third assignment of error is overruled.

## CONCLUSION

{¶62} Appellant's three assignments of error are overruled and the judgment of the Stark County Court of Common Pleas is affirmed.


By: Delaney, J.,

Hoffman, P.J. and

Wise, John, J., concur.