[Cite as *State v. Daniels*, 2021-Ohio-4142.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 21CA0025 |
| | : | |
| DELANEY DANIELS | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:      Appeal from the Licking County Court of
                             Common Pleas, Case No. 19CR602


JUDGMENT:                     AFFIRMED


DATE OF JUDGMENT ENTRY:       November 19, 2021


APPEARANCES:


For Plaintiff-Appellee:                    For Defendant-Appellant:

WILLIAM C. HAYES                           TODD W. BARSTOW
LICKING CO. PROSECUTOR                     161 West Johnstown Rd., Ste. 204
PAULA M. SAWYERS                           Columbus, OH 43230
20 S. Second St., Fourth Floor
Newark, OH 43055

*Delaney, J.*

{¶1} Appellant Delaney Daniels appeals from the March 5, 2021 Judgment of Conviction and Sentence of the Licking County Court of Common Pleas. Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2} This case arose around 10:00 p.m. on August 7, 2019, when appellant shot and killed Matthew Helman while robbing him during a drug deal.

*Sasha Diehl agrees to sell Brianna Lohr an ounce of meth*

{¶3}  In August 2019, Alexandra "Sasha" Diehl was struggling with an addiction to methamphetamine.  She and her boyfriend, Matthew Helman, had a child together and sometimes sold drugs to make ends meet.  Sasha found buyers among people she used with, and Helman supplied the drugs and protection during the transaction.  On August 7, Sasha communicated with Brianna Lohr regarding the sale of an ounce of methamphetamine for $450. Lohr insisted she had the cash to make the buy, but asked Sasha to travel to Newark to complete the transaction.

{¶4} Unbeknownst to Sasha, Lohr and her boyfriend—appellant—had no intention of paying Sasha for drugs. Instead, they intended to rob her, viewing her as an easy target. Lohr provided appellant with a pink pistol which he stowed in his waistband in anticipation of the robbery.

{¶5} Sasha and Lohr communicated via text message and phone calls to arrange a location to meet, eventually settling upon the dead-end street of Elmwood in  Newark. Helman drove a silver Honda Civic with Sasha in the front passenger seat. Sasha observed Lohr come out from between two houses, unexpectedly accompanied

by appellant.   Sasha didn't know appellant personally but knew him to associate with Lohr.

{¶6} Lohr got into the back seat of the Civic behind Helman and appellant got into the back seat behind Sasha. Sasha turned slightly to greet the two, but appellant pointed a gun at Helman and said words to the effect of, "Give me everything you've got." At some point, appellant pointed the gun at Helman's head. Helman, who was left-handed, turned slightly to show appellant that he, too, had a gun. Sasha testified that as soon as Helman showed appellant his gun, three shots were fired.

{¶7}  Helman had not put the car in park and it moved forward, smashing into a truck parked on the street. Sasha opened her door and was thrown out of the car. She lay curled on the ground. Appellant got out of the car and stood over her with a gun, again demanding "Give me everything you've got."  Sasha heard a clicking and snapping sound, and appellant looked at the gun.  Then he ran off.

{¶8} Sasha checked on Helman, thinking he may have been pistol-whipped. She didn't see any blood and didn't realize he was shot until she tried to "wake him up" to no avail. She became hysterical as she realized Helman could not be revived. At some point, Sasha handed off a bag of meth to a bystander before police arrived.

{¶9}  Lohr was also addicted to methamphetamine and was appellant's girlfriend at the time of these events. At trial, she acknowledged her truthful testimony was in exchange for a plea deal with appellee, wherein Lohr would plead to involuntary manslaughter, aggravated robbery, and a 3-year firearm specification, and would serve a prison term of 18 years.

{¶10} Lohr testified to the plan to rob Sasha. The plan began when Sasha reached out to her, offering to sell meth. Lohr and appellant intended to rob Sasha from the beginning and had no money to pay for the meth. Lohr testified that she and appellant encountered Jane Doe and Harold Hadnot on the night of the robbery before it occurred, and told the two of their plans. The Civic was parked on Elmwood Street at the dead end, and Lohr and appellant walked to the car. They got in; Lohr greeted Sasha; appellant pulled the gun and told Helman to park the car. Lohr testified that she jumped out of the car at that point and took off running, but heard two gunshots behind her as she ran.

{¶11} Lohr testified that appellant caught up to her at a "flophouse" on Mount Vernon Road. Appellant now had two guns with him, and told her he took one from Helman. Appellant told Lohr he got shot at, shot back, and took Helman's gun. Lohr said appellant shaved his face and changed clothes in an attempt to change his appearance, and left the flophouse with Aaron Elliott.

{¶12} Lohr was located by police and interviewed on the night of the shooting. She told police about the robbery and her role in it; then she was arrested and has remained in jail since. Lohr testified appellant has contacted her from jail via calls and letters, telling her to change her story to make it consistent with his, and threatening her if she failed to do so.

*Jane Doe encounters Lohr and appellant before and after the crimes*

{¶13} In August 2019, Jane Doe also struggled with drug addiction. She lived on Elmwood Avenue and knew Lohr. The day before this incident, Doe noticed Lohr at the Mount Vernon flophouse, complaining that she was hungry but had no money.

{¶14} On August 7, 2019, Doe planned to walk back to the flophouse from where she was staying on Elmwood. As she left, she encountered Harold Hadnot in the front yard, on a bicycle. She and Hadnot spoke briefly when Lohr and appellant approached them. Appellant asked Hadnot if he wanted to help them rob people at the end of the street. Doe looked over and noticed a car parked on Elmwood. Hadnot asked whether guns were involved and said he wanted no part of it, then rode off on his bicycle. Doe continued walking in the direction of Mount Vernon, and appellant and Lohr continued walking toward the car.

{¶15} Lohr and appellant had come from the same flophouse that was Doe's destination. Lohr told Doe "Gary" and several other people were there. As Doe walked in that direction, she heard two gunshots and screaming from the direction of Elmwood. Doe took off running to the flophouse. When she arrived, she banged on the door and begged to be let in. "Gary" moved a large piece of wood he kept over the door to keep people out and let Doe in.

{¶16} Lohr and appellant arrived at the flophouse shortly after Doe, and Gary let them in as well. Doe described the two as "frantic," and Lohr was crying. Doe said both were holding guns, and one was pink. Appellant said to Gary, "I just shot a dude. I think he's slumped." Doe understood "slumped" to mean dead. Appellant showed Gary a shell in his hand, and said he tried to find them all but could only find one. Doe also heard appellant say, "He was going to shoot me so I shot him." Appellant and Lohr started removing their clothes. Gary gave Doe and another woman present a few dollars and told them to essentially get lost. Doe and the woman went to a nearby convenience store and bought snacks.

{¶17} Doe gave a statement to law enforcement that night and told them what she knew about events leading up to the robbery and its aftermath.

{¶18} Doe considered appellant a friend and still does. She has had two conversations with appellant since August 7, 2019; one of those conversations also included Aaron Elliott. Doe is afraid of Elliott. Doe testified that appellant tried to persuade her to go to the police and change her statement, and Elliott threatened her if she refused to do so.

{¶19} Defense trial counsel cross examined Doe about her recollection of appellant's statements at the flophouse. Doe unequivocally testified appellant said, "That dude was going to shoot me, so I shot him." She denied that appellant ever said, "Dude shot at me."

### Investigation immediately points to Lohr and appellant

{¶20} Newark police were initially dispatched to an auto accident at the dead-end of Elmwood, but the call changed to "shots fired." Upon arrival at the scene, officers found a crashed silver Honda Civic. The passenger door was open and a victim was seated in the driver's seat. A female, later identified as Sasha Diehl, screamed and cried on the sidewalk, and bystanders milled around.

{¶21} Officers pulled the victim out of the vehicle and initially believed this was a potential overdose because there were no visible injuries. Medics arrived and waited for police to clear the scene. One officer noticed a gunshot through the roof of the car, leading to suspicion that the victim was shot although no gunshot wound was immediately apparent. Sasha identified the victim as Matthew Helman. Officers looked for a firearm at the scene but didn't find any.

{¶22} Sasha told police at the scene that she and Helman were there to meet Lohr and appellant, whose name she didn't know. An officer pulled up Lohr's Facebook page and found a photo of appellant, whom Sasha identified as the person who got into the car with Lohr and shot Helman.

{¶23} Officers texted detectives and each other with pertinent descriptive information on Lohr and appellant, including their names, descriptions, and known haunts. Officer Bill Evans knew of several flophouses near the scene and advised K-9 units to track those locations. Word came in that an officer may have spotted appellant near the flophouse on Mount Vernon, so police headed in that direction.

{¶24} Police also contacted Jane Doe, who said she was hungry. Officers told her she could eat while she gave a statement. Police obtained a statement from Sasha, who said she was inside the car when appellant shot Helman.

{¶25} The Chief Deputy Coroner who supervised Helman's autopsy testified that a gunshot entrance wound was located on his right arm. Tracing the trajectory of the bullet, it traveled through the victim's right arm without striking bone, through the armpit, came out the inside of his arm, and entered his chest. The bullet crossed Helman's right lung, collapsing it, and entered his aorta. The bullet then went through the victim's left lung and lodged in the muscle in the left side of his back, just under the shoulder blade, without exiting the body. Helman's manner of death was homicide; the cause of death was the gunshot wound to the arm and chest, which caused Helman's blood pressure to cease. Helman died within minutes from a lack of blood to the brain.

{¶26} Appellant was apprehended the night of the shooting. The officer transporting him to the jail first escorted appellant outside for a cigarette, and briefly turned

away to text another officer about the status of jail paperwork. When the officer turned away, appellant took off running despite having bare feet and his hands cuffed behind him. He was apprehended a short distance away and said to the officer, "You guys are going to take my life away; I had to try."

{¶27} Lohr's pink pistol was never found. Appellant admitted to detectives that he removed a shell casing and Helman's gun from the scene; both of these items were found at the Mount Vernon flophouse.

*Indictment, trial, conviction, and sentence*

{¶28} Appellant was charged by indictment as follows: one count of aggravated murder pursuant to R.C. 2903.01(B), an unclassified felony [Count I]; one count of murder pursuant to R.C. 2903.02(B), an unclassified felony [Count II]; one count of aggravated robbery pursuant to R.C. 2911.01(A)(1), a felony of the first degree [Count III]; one count of escape pursuant to R.C. 2921.34(A)(1), a felony of the second degree [Count IV]; one count of having weapons under disability pursuant to R.C. 2923.13(A)(2), a felony of the third degree [Count V]; one count of tampering with evidence pursuant to R.C. 2921.12(A)(1), a felony of the third degree [Count VI]. Counts I, II, and III were accompanied by firearm specifications pursuant to R.C. 2941.145(A). The indictment also contained a repeat-violent-offender (R.V.O.) specification pursuant to R.C. 2941.149(A).

{¶29} Appellant entered pleas of not guilty and the matter proceeded to trial by jury. Before trial, appellant waived his right to trial by jury upon Count V and the R.V.O. specification; those matters were therefore decided by the trial court.

{¶30} Appellant was found guilty as charged. The trial court sentenced appellant to an aggregate indefinite prison term of 40 years to life.

{¶31} Appellant now appeals from the trial court's March 5, 2021 Judgment of Conviction and Sentence.

{¶32} Appellant raises three assignments of error:

**ASSIGNMENTS OF ERROR**

{¶33} "I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF AGGRAVATED MURDER; MURDER; AGGRAVATED ROBBERY; TAMPERING WITH EVIDENCE; ESCAPE; AND HAVING WEAPONS UNDER DISABILITY AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶34} "II. THE TRIAL COURT SENTENCED APPELLANT TO AN INDEFINITE TERM OF INCARCERATION PURSUANT TO A STATUTORY SCHEME THAT VIOLATES APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS."

{¶35} "III. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY SENTENCING HIM IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES."

**ANALYSIS**

I.

{¶36} In his first assignment of error, appellant asserts his convictions upon each count are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶37} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶38} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering

a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶39} Although appellant frames this assignment of error as a challenge to all of his convictions, his argument addresses only Count I, aggravated murder. Appellant was convicted upon one count of aggravated murder pursuant to R.C. 2923.01(B), which states in pertinent part: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery * * *." Appellant claims appellee presented insufficient evidence that he purposely caused Helman's death. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶40} Appellee presented evidence that appellant and Lohr intended to rob Sasha and that Lohr provided appellant with a pistol for that express purpose. Once appellant and Lohr entered the car, appellant pulled the gun almost immediately and told Sasha, "Give me everything you've got." When Helman showed his own gun, appellant fired at least twice, striking Helman in the right arm.

{¶41} The trial court instructed the jury as follows:

> * * * *.
>
> Purposely. Purpose is an essential element of the offense of aggravated murder.

A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question, there was present in the mind of the defendant a specific intention to cause the death of Matthew Helman.

Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally.

Purpose and intent mean the same thing.

The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person does an act is determined from the manner in which it is done, the means it used, and all the other facts and circumstances in evidence.

If a wound is inflicted on a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause death may be, but is not required to be, inferred from the use of the weapon. The inference, if not made, is not conclusive.

* * * *.

T. 1196-1197.

{¶42} The jury could reasonably believe from the evidence presented that appellant shot at Helman with the specific intention of killing him. This murder occurred within the confined space of a vehicle. Appellant immediately pulled a gun on Helman and his reaction to Helman's brandishing of a gun was to shoot him. Appellant was later

overheard stating, "Dude was going to shoot me so I shot him," thereby summarizing his purposeful act. The jury could reasonably find appellant shot Helman with the conscious objective of causing Helman's death.

{¶43} In his brief, appellant misquotes the jury instruction in a consequential way. He argues the trial court told the jury, "If you find that the defendant used a deadly weapon against another in a manner calculated to destroy life….," but the accurate instruction is, "[i]f a wound is inflicted on a person with a deadly weapon in a manner calculated to destroy life…." *Id.* Appellant argues the mere fact of **carrying a firearm for protection during a drug deal*** doesn't rise to the level of purposely intending to cause the victim's death. But the cited portion of the instruction emphasizes the key is the appellant's act of pulling the trigger, thereby inflicting the wound.

{¶44} Appellant implies that because Helman was shot in the arm, appellant didn't purposely intend to cause his death. Shooting someone in the arm inside a Honda Civic does not leave room for speculation as to appellant's purpose. The jury could reasonably find he intended to kill Helman.

{¶45} Appellant directs us to our decision in *State v. Grimes*, 5th Dist. Richland No. 2019CA0103, 2020-Ohio-4357, at ¶ 46, in which we addressed the element of "purposely:"

> * * * *. A person has knowledge of circumstances when he is aware that such circumstances probably exist. R.C. 2901.22(B). It is well-established that one may be presumed to intend results which are the natural, reasonable, and probable consequences of his voluntary actions. *State v. Farmer*, 156 Ohio St. 214, 102 N.E.2d 11

(1951). Further, "it is not necessary that the accused be in a position to foresee the precise consequence of his conduct, only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *State v. Wilson*, 5th Dist. Richland No. 13CA39, 2014-Ohio-41, quoting *State v. Losey*, 23 Ohio App.3d 93, 491 N.E.2d 379 (10th Dist. 1995).

{¶46} We agree that *Grimes* is instructive, although in our reading it supports the jury's verdict that appellant acted purposely. Helman's injuries and death are a reasonably foreseeable result of appellant's actions. *Grimes,* supra at ¶ 47. Appellant may not have foreseen the precise injuries the victims would sustain as a result of his actions, but the injuries were within the scope of the risk created by his conduct. *Id.,* citing *State v. Lett*, 8th Dist. Cuyahoga No. 106973, 2019-Ohio-532.

{¶47} Based on the testimony and evidence in this case, we find any rational trier of fact could have found the essential elements of R.C. 2903.01(B) proven beyond a reasonable doubt. We find sufficient evidence exists to support appellant's convictions and the convictions are not against the manifest weight of the evidence. Appellant's first assignment of error is overruled.

II.

{¶48} Appellant's second assignment of error challenges the constitutionality of the Reagan Tokes Act, which codified hybrid indefinite prison terms for first- and second-degree felonies. Appellant challenges the presumptive-release feature of the act, R.C. 2967.271, and advances several arguments, including it violates his constitutional rights

to trial by jury and due process of law, and further violates the constitutional requirement of separation of powers and equal protection. We disagree.

{¶49} We note appellant did not raise the constitutionality of R.C. 2967.271 before the trial court and has not argued defense trial counsel was ineffective in failing to do so. We addressed the concept of ripeness for review in regard to the Reagan Tokes Act in *State v. Downard*, 5th Dist. Muskingum, CT2019, 2020-Ohio-4227, appeal allowed, 160 Ohio St.3d 1507, 2020-Ohio-6835, 159 N.E.3d 1152:

> The Ohio Supreme Court discussed the concept of ripeness for review in *State ex rel. Elyria Foundry Co. v. Indus. Comm.*, 82 Ohio St.3d 88, 1998-Ohio-366, 694 N.E.2d 459:

> Ripeness "is peculiarly a question of timing." *Regional Rail Reorganization Act Cases* (1974), 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320, 351. The ripeness doctrine is motivated in part by the desire "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies * * *." *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691. As one writer has observed:

> The basic principle of ripeness may be derived from the conclusion that 'judicial machinery should be conserved for problems which are real or present and imminent, not squandered on problems which are abstract or hypothetical or remote.' * * * [T]he prerequisite of ripeness is a limitation on jurisdiction that is nevertheless basically

optimistic as regards the prospects of a day in court: the time for judicial relief is simply not yet arrived, even though the alleged action of the defendant foretells legal injury to the plaintiff. Comment, *Mootness and Ripeness: The Postman Always Rings Twice* (1965), 65 Colum. L.Rev. 867, 876. Id. at 89, 694 N.E.2d at 460.

In *State v. McCann*, 8th Dist. Cuyahoga No. 85657, 2006-Ohio-171, the defendant argued because the Parole Board, pursuant to R.C. 2967.28, could extend his sentence by up to an additional five years for violation of post-release control, the statute was unconstitutional. The Eighth District Court of Appeals concluded because McCann was not currently the subject of such action by the Parole Board, the issue was not yet ripe for review. *Id.* at ¶6.

Likewise, in the instant case, while R.C. 2967.271 allows the DRC to rebut the presumption Appellant will be released after serving his nine-year minimum sentence and potentially continue his incarceration to a term not exceeding thirteen years, Appellant has not yet been subject to such action by the DRC, and thus the constitutional issue is not yet ripe for our review.

*State v. Downard*, 5th Dist. Muskingum, CT2019, 2020-Ohio-4227, supra, ¶ 8-11, appeal allowed, 160 Ohio St.3d 1507, 2020-Ohio-6835, 159 N.E.3d 1152; see also, *State v. Buckner*, 5th Dist. Muskingum Nos. CT2020-0023 & CT2020-0024, 2020-Ohio-7017; *State v. Wolfe*, 5th Dist. Licking No. 2020CA00021, 2020-Ohio-5501;

State v. Cochran, 5th Dist. Licking No. 2019 CA 00122, 2020-Ohio-5329; State v. Clark, 5th Dist. Licking No. 2020 CA 00017, 2020-Ohio-5013; State v. Manion, 5th Dist. Tuscarawas No. 2020 AP 03 0009, 2020-Ohio-4230; State v. Kibler, 5th Dist. Muskingum No. CT2020-0026, 2020-Ohio-4631.

{¶50} Appellant does not dispute he is not yet subject to the provisions of R.C. 2967.271. We therefore find here, as we did in Downard, that his constitutional challenge is not yet ripe for review. State v. Williams, 5th Dist. Coshocton No. 2021CA0003, -- N.E.3d--, 2021-Ohio-3579, ¶ 19; State v. Chester, 5th Dist. Stark No. 2020CA00028, 2021-Ohio-918, ¶ 61, appeal not allowed, 163 Ohio St.3d 1495, 2021-Ohio-2270, 169 N.E.3d 1282.

{¶51} We find no error in the trial court's sentence. Appellant's second assignment of error is overruled.

III.

{¶52} In his third assignment of error, appellant argues the trial court's sentence violates the principles and purposes of felony sentencing and does not comply with Ohio sentencing statutes. We disagree.

{¶53} We review felony sentences using the standard of review set forth in R.C. 2953.08. State v. Marcum, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶22; State v. Howell, 5th Dist. Stark No. 2015CA00004, 2015-Ohio-4049, ¶ 31. R.C. 2953.08(G)(2) provides we may either increase, reduce, modify, or vacate a sentence and remand for resentencing where we clearly and convincingly find that either the record does not support the sentencing court's findings under R.C. 2929.13(B) or (D),

2929.14(B)(2)(e) or (C)(4), or 2929.20(I), or the sentence is otherwise contrary to law. *See, also, State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.2d 659, ¶ 28.

{¶54} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, 161 Ohio St. at 477, 120 N.E.2d 118.

{¶55} Appellant argues the trial court failed to comply with R.C. 2929.11 [overriding purposes of felony sentencing] and R.C. 2929.12 [factors to consider in felony sentencing]. Recently, the Ohio Supreme Court addressed whether a sentence is "contrary to law" under R.C. 2953.08(G)(2)(b) if an appellate court finds that the record does not support a sentence with respect to R.C. 2929.11 and 2929.12. *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649. A plurality of the Court in *Jones* noted nothing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12. *Id.*, ¶ 42. Additionally, neither R.C. 2929.11 nor 2929.12 requires a trial court to make any specific factual findings on the record. *Id.*, ¶ 20, citing *State v. Wilson,* 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 31.

{¶56} Turning to appellant's argument, we are foreclosed from weighing the evidence and substituting our judgment for that of the trial court in determining whether

the sentence complies with R.C. 2929.11 and R.C. 2929.12. Nonetheless, the record supports the trial court's decision to impose a prison term. Appellant was found guilty of shooting and killing Helman, pointing a gun at and robbing Sasha, taking and hiding evidence from the scene, fleeing from the scene, and running from officers while in custody.  Appellant also tried to intimidate and harass witnesses against him.  He showed a lack of remorse.  Finally, at the time of the murder and related crimes, appellant was on post-release control for aggravated robbery and was released from prison less than a month prior. Appellant had numerous disciplinary actions during his prison stint, further indicating a significant risk of recidivism.

{¶57} The record before us clearly and convincingly supports the sentence of the trial court. Appellant has not pointed to any evidence that the trial court abused its discretion and the sentence complies with the purposes and principles of felony sentencing.

{¶58} Appellant's third assignment of error is therefore overruled.

## CONCLUSION

{¶59} Appellant's three assignments of error are overruled and the judgment of

the Licking County Court of Common Pleas is affirmed.

By:  Delaney, J., and

Wise, John, J. concur; and

Gwin, P.J., concurs in part,
and dissents, in part.

*Gwin, J., concurs in part; dissent in part.*

{¶60} I concur in the majority's disposition of Appellant's First and Third Assignments of Error.

{¶61} I respectfully dissent from the majority's opinion concerning ripeness and Appellant's Second Assignment of Error for the reasons set forth in my dissenting opinion in *State v. Wolfe,* 5th Dist., Licking No. 2020 CA 00021, 2020-Ohio-5501.

{¶62} I further note that the Ohio Supreme Court has accepted a certified conflict on the issue of whether the constitutionally of the Reagan Tokes Act is ripe for review on direct appeal or only after the defendant has served the minimum term and been subject to extension by application of the Act. *See, State v. Maddox*, 6th Dist. Lucas No. L-19-1253, 2020-Ohio-4702, *order to certify conflict allowed, State v. Maddox*, 160 Ohio St.3d 1505, 2020-Ohio-6913, 159 N.E.3d 1150(Table) The conflict cases are *State v. Leet*, 2d Dist. Montgomery No. 28670, 2020-Ohio-4592; *State v. Ferguson*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153; *State v. Barne*s, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150; and *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837; *See also, State v. Downard,* 5th Dist. Muskingum No. CT2019-0079, 2020-Ohio-4227, *appeal accepted on Appellant's Proposition of Law No. II*, *State v. Downard*, 160 Ohio St.3d 1507, 2020-Ohio-6835, 159 N.E.3d 1507 (Table)(Sua sponte, cause held for the decision in 2020-1266, *State v. Maddox*). The Ohio Supreme Court heard oral arguments on that case on June 29, 2021.