[Cite as *State v. Kirkman*, 2024-Ohio-5276.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


STATE OF OHIO

     Plaintiff-Appellee

-vs-

MICHAEL KIRKMAN

     Defendant-Appellant

JUDGES:
Hon. W. Scott Gwin, P.J.
Hon. John W. Wise, J.
Hon. Andrew J. King, J.

Case No. 2024 CA 00029


O P I N I O N


CHARACTER OF PROCEEDING:      Criminal Appeal from the Court of Common Pleas, Case No.I 2023 CR 02326


JUDGMENT:      Affirmed


DATE OF JUDGMENT ENTRY:      November 4, 2024


APPEARANCES:

For Plaintiff-Appellee

KYLE STONE
PROSECUTING ATTORNEY
VICKI L. DeSANTIS
ASSISTANT PROSECUTOR
110 Central Plaza South, Suite 510
Canton, Ohio  44702-1413

For Defendant-Appellant

BERNARD HUNT
2395 McGinty Road, NW
North Canton, Ohio  44720

*Wise, J.*

{¶1}   Appellant Michael Kirkman, appeals his conviction on one count of Domestic Violence and one count of Obstructing Official Business, entered in the Stark County Court of Common Pleas following a jury trial.

{¶2}   Appellee is the state of Ohio.

### STATEMENT OF THE FACTS

{¶3}   For purposes of this Opinion, the relevant facts and procedural history are as follows:

{¶4}   This case arises out of an incident which occurred on October 7, 2023, wherein T.M. called 9-1-1, alleging Appellant, Michael Kirkman, caused her injury during a physical altercation.

{¶5}   On November 30, 2023, a Stark County grand jury indicted Defendant-Appellant Michael Kirkman on one count of Domestic Violence, in violation of R.C. §2919.25(A)/(D), a third-degree felony based on his two prior convictions of related offenses under R.C. §2919.25(D)(4); and, one count of Obstructing Official Business, in violation of R.C. §2921.31(A)/(B), a second-degree misdemeanor.

{¶6}   On December 8, 2023, in lieu of arraignment, Appellant filed a written plea of not guilty to said charges.

{¶7}   The matter proceeded to a jury trial on January 31, 2024.  At trial, the jury heard the following testimony:

{¶8}   Officer Caleb Bodjanac, an officer with the Canton Police Department, was the sole witness who testified at trial. T.M. did not show for trial.

{¶9}  Officer Bodjanac testified that on October 7, 2023, he and an officer-in-training, Cadet Franks, responded to 1866 Sixth Street NE, Apartment 102, ("Hillview Apartments"), in Stark County, Ohio, pursuant to a dispatch regarding a 9-1-1 call from the victim ("T.M."). (T. at 97-100).

{¶10}  On the 9-1-1 recording, which is 3:22 minutes long, T.M. said, "My boyfriend is being physical." She stated that her address was "1866 Northeast Hillview apartments," and told the operator "but I left and went across the street where I was safe ma'am, . . . I didn't want to get hit no more."

{¶11}  At first T.M. said, "I stay in apartment 102." T.M. then told the operator, "I haven't lived there very long" and then stated that her apartment number was "201," adding, "because I lived on the second floor." T.M. told the operator that Appellant Kirkman's birthday is December 23, 1976, ... yes, December 22." T.M. told the operator, that Kirkman was "smacking me in the face, he head-butted me, ... I have bruises all over me, I don't need an ambulance ... I'm scared it's going to go too far' ... I'm scared for my life."

{¶12}  Officer Bodjanac was wearing his body camera that day and the State played the video for the jury. (T. at 99). T.M. told the officer that Kirkman lived with her and that they had lived together for eight months. (T. at 121). T.M. told Officer Bodjanac that Kirkman was "beating my ass and [she] [could not] take it anymore." *Id.* She described welts and bruises that Kirkman left on her body that day and the previous couple of days. *Id.* T.M. stated, "He tortures me." *Id.* She told Kirkman, "I don't want to argue, you're whooping my ass. I can't take much more." *Id.* While she was doing the laundry, Kirkman "came flying down the hallway" and T.M. said, "I cowered because I'm

scared, he kicked me in the head, stomped on my toes, smacked me." *Id.* Kirkman told her, "You better follow me home, I'm going to kill your cat." *Id.* T.M. repeated that they had "been together eight months." *Id.* "He totally destroyed my apartment." *Id.*

**{¶13}** Officers had T.M. fill out a domestic violence statement while she was at the neighbor's residence and then proceeded to take pictures of her injuries. T.M. told the officers, "I was coming to the other day, ... he choked me out ... he would kill me so fast." *Id.*

**{¶14}** During Officer Bodjanac's testimony, he identified T.M.'s domestic violence statement. (T. at 100-101). In the statement, T.M. wrote:

I, the undersigned, state that at 3:30 on the 7th day of Oct, 2023 at 1866 Hillview Apt, Mike Kirkman who is related to me as my boyfriend committed acts of Domestic Violence ... where he or she resides or has resided with me by: (sic)

Today he was really angry because I went to the next building to wash laundry and he no stop (sic) kept calling my phone and told me if I didn't come home now he was coming over to the laundry room to whoop my fucking whore ass. I said no, and before I knew it he was running toward me and kicking me in the side of the head and punched my arms over and over. I was able to stop him long enough to run to my neighbors (sic) house that's when I called the cops.

**{¶15}** Officer Bodjanac took several photographs of T.M. 's injuries which showed her face with a swollen and bruised nose, bruising on her right and left arms, her right side, and lower back. (T. at 101-103). At that point, based on the evidence, Officer

Bodjanac determined that he had enough information to arrest Appellant and went to Hillview Apartments to locate him. (T. at 103-104). However, T.M. had given officers the wrong apartment number, Apartment 201 was a vacant apartment. (T. at 104). T.M. apologized and explained she had not lived there for very long. *Id.*

{¶16} Officers had T.M. accompany them to the apartment complex to show them where she lived. (T. at 104). The actual apartment number was 102, so the officers knocked on the door, but received no response. (T. at 104-105). Officer Bodjanac then used the key provided by T.M. to unlock the door and continued to announce his presence. (T. at 105). The State again played a portion of his body cam which showed the officers entrance into and search of the apartment. (T. at 105).

{¶17} The officers found Appellant hiding under a pile of clothes behind a couch in the bedroom. *Id.* T.M. was waiting outside by the cruiser and as the officers brought Appellant outside, arrested him, and placed him in the back of the cruiser, she. told the officers to let Appellant know that she would call his parents and have them come and get his dog and things from the apartment. *Id.*

{¶18} Officer Bodjanac described to the jury how the officers searched every area of the house while trying to maintain cover in open areas such as hallways and doors. (T. at 105-106). He stated that the apartment was a mess with stuff strewn everywhere, so the officers moved slowly through the living room areas. (T. at 106). When Officer Bodjanac began to search in the first bedroom he saw a space behind the couch in the corner where clothes were piled up. (T. at 106). As he reached down to see if someone was there, he grabbed the top of Appellant's head. (T. at 106-107). The officers did not know if Appellant was armed or how he would react toward police, so they ordered him

to show them his hands and to come out from behind the couch. (T. at 107). The officers ultimately had to pull him out because he refused to follow their commands. (T. at 107).

**{¶19}** Once Appellant was out from behind the couch and the officers could see his hands, they were able to place him in handcuffs and taken him into custody. (T. at 107). By that time, additional police officers had arrived to assist. (T.at 107).

**{¶20}** The jury also heard clips of several jail-house calls between T.M. and Appellant. (T. at 108-111).

October 17, 2023 - 1:03 minutes long- "You have to go and make a statement, get it notarized, take it to the court saying you don't want to do this."

November 23, 2023 at 11:28 a.m. - 5:36 minutes long- "I'm not going to court ... and I'm not going to testify." "I fucking gave your brother your (bag) things. Inaudible. "I made sure your family got your stuff." (T.M. speaking).

November 23, 2023 at 11:46 a.m. - 1:34 minutes long- "Thanks for letting me apologize." (Appellant speaking).

November 24, 2023 - 6:09 minutes long- "Maybe you should press charges on me ... This will never make me leave you alone ... Just, remember till death, do us part ... You're a bitch." (Appellant speaking).

"I'm not pressing charges against you ... I'm moving on with my life." (T.M. speaking)

"You're not going to, I won't let you, till death do us part." (Appellant speaking)

November 26, 2023 - 7:50 minutes long- "Maybe you should really press charges . . . You better find someone who is going to protect you from me because I'm going to kill you ... And, then I'm going to kill myself ... You made me promise you that I'd be your man." (Appellant speaking).

December 2, 2023 - 1:05 minutes long- "If you're asked, and you may be contacted to be asked, ... at least say I didn't live there ... because they have to prove that I lived with you for it to be domestic violence." (Appellant speaking).

December 9, 2023 - 3:51 minutes long- "You know if you get out you can't come here right ... You're going to get in trouble I have a restraining order on you"

"I want my dog ... you don't understand ... it's going to be very bad when I get out ... I'll go right to the grave because then I'm going to take everybody I can with me ... you don't understand, I have a death wish . . . you are the main obstacle in it ... it will come back to you, I told you, the shadow ... As of right now, you better make sure you are safe ... And, restraining orders they don't mean shit ... My dog."  (Appellant speaking.)

**{¶21}** In addition, the State also played a jail call between Appellant and his mother. *Id.*

October 12, 2023 - 04:31 minutes long "I pushed her away and fucking hit her to get her off me ... All my jewelry, all my clothes." "Ma, you need to call her tonight and tell her not to go [to court]." (Appellant speaking).

"I can try ... You should have thought about that before you hit her."

(Appellant's mother speaking).

"If a woman is man enough to hit a man, she's man enough to get hit

back." "Tell her don't do this to me ... Call her mom." (Appellant speaking).

**{¶22}** Officer Bodjanac identified the voices in the calls as Appellant's and T.M.'s

voices. (T. at 108). In several jail calls, Appellant would start the calls with T.M.by saying

"Hello beautiful", but by the end of the conversation he was telling T.M. that he would kill

her.

**{¶23}** Officer Bodjanac identified Appellant in open court. (T. at 116).

**{¶24}** Following deliberations, the jury returned verdicts finding Appellant guilty on

both counts.

**{¶25}** On February 5, 2024, the trial court held a sentencing hearing wherein it

sentenced Appellant to thirty-six (36) months in prison.

**{¶26}** Appellant now appeals, raising the following errors for review:

<u>ASSIGNMENTS OF ERROR</u>

**{¶27}** "I. APPELLANT'S CONVICTION OF ROBBERY [SIC] WAS NOT

SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE

**{¶28}** "II. APPELLANT'S CONVICTION OF ROBBERY [SIC] WAS AGAINST

THE MANIFEST WEIGHT OF THE EVIDENCE."

**I., II.**

**{¶29}** In his first and second assignments of error, Appellant argues his domestic

violence conviction is against the manifest weight and sufficiency of the evidence. We

disagree.

{¶30} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks,* 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

{¶31} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 1997-Ohio-52, *quoting State v. Martin*, 20 Ohio App. 3d 172, 175 (1st Dist. 1983).

{¶32} Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶33} Appellant was convicted of committing Domestic Violence, in violation of R.C. §2919.25(A), which provides:

> (A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.

{¶34} R.C. §2919.25(F)(1)(a)(1) defines "household member" as follows:

> (F) As used in this section and sections 2919.251 and 2919.26 of the Revised Code:
>
> (1) "Family or household member" means any of the following:

(a) Any of the following who is residing or has resided with the offender:

(i) A spouse, a person living as a spouse, or a former spouse of the offender;

(ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender;

(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender.

(b) The natural parent of any child of whom the offender is the other natural parent or is the putative other natural parent.

(2) "Person living as a spouse" means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.

**{¶35}** The trial court instructed the jury as follows:

Family or household member means a person who has resided with the Defendant and who had lived as a spouse of the Defendant within the past five years.

Person living as spouse means a person who is cohabitating with the Defendant.

Reside means to live in a place on an ongoing basis.

Cohabit means the sharing of family or financial responsibilities or consortium.

Family or financial responsibilities may include such things as providing shelter, food, clothing, utilities, and combining assets.

Consortium may include such things as mutual respect, fidelity, affection, society, cooperation, solace, aid to each other, friendship, and sexual relations.

**{¶36}** (T. at 132-33).

**{¶37}** Here, Appellant argues the State failed to prove the victim was a family or household member.

**{¶38}**  Upon review of the evidence as set forth in our Statement of the Case and Facts, *supra*, as well as the entire record in this matter, we find Appellant's domestic violence conviction was not against the manifest weight or sufficiency of the evidence.

**{¶39}** As set forth above, Officer Bodjanac testified that T.M. identified Appellant, who was present in the apartment when the officers arrived, as her assailant. Video footage from the body cameras corroborate the officers' testimony and allowed the jury to hear T.M.'s account of the incident in real time. The jury also heard the jail calls between Appellant and T.M. and Appellant and his mother. Additionally, the jury had before it the 9-1-1 call and the domestic violence statement made by T.M. The jury also saw photographs taken by Officer Bodjanac of T.M. reflecting the injuries she received the evening of the assault.

**{¶40}** T.M. told Officer Bodjanac more than once that she and Appellant had been living together for eight months. (T. at 121, Body camera footage). She also told the officers that Appellant threatened her by telling her "You better follow me home; I'm going to kill your cat." (Body camera footage). Her domestic violence statement also stated that he told her "if I didn't come home now he was coming over to the laundry room to whoop my fucking whore ass."

**{¶41}** In the jail calls, Appellant made reference to his things being at T.M.'s apartment, including his clothes, jewelry and his dog. (Oct. 12, 2023, jail call; December 9, 2023, jail call). In another jail call, Appellant asked T.M. to say that they did not live together so that he could not be charged with domestic violence. (December 2, 2023, jail call).

**{¶42}** The testimony of one witness, if believed by the jury, is enough to support a conviction. *State v. Barnett*, 2019-Ohio-3944, ¶¶ 45-46 (5th Dist.), citing *State v. Dunn*, 2009-Ohio-1688, ¶ 133 (5th Dist.). After weighing the evidence and evaluating the credibility of the witnesses, with appropriate deference to the trier of fact's credibility determination, we cannot say that the jury clearly lost its way and created a manifest injustice with regard to the domestic-violence conviction. It is well-established that a domestic violence conviction does not require the testimony of the victim. Over twenty years ago, the unique nature of domestic violence prosecutions was acknowledged in *State v. Lee*, 73 Ohio Misc.2d 9, 14 (M.C.1995):

> No rule of law requires that a battered partner testify against a once loved one for the state to proceed on a charge of domestic violence. Murder cases obviously go forward without the testimony of the victim—because

she/he's dead. Thus, if domestic violence cases are properly investigated and prepared for trial, the victim's presence at trial may not be required.

{¶43} Construing all of the evidence in favor of Appellee, sufficient evidence supports Appellant's conviction. Also, this is not the case in which the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered. Appellant's conviction is not against the manifest weight of the evidence.

{¶44} Appellant's first and second Assignments of Error are denied.

{¶45} For the reasons stated in the foregoing opinion, the decision of the Stark County Common Pleas Court is affirmed.

By: Wise, J.

Gwin, P. J., and

King, J., concur.

JWW/kw 1022